**KIM MANUFACTURING, INC.,**
**Respondent,**

v.

**SUPERIOR METAL TREATING,**
**INC., Appellant.**

**No. 27260.**

Missouri Court of Appeals,
Kansas City District.

May 3, 1976.
Rehearing Denied June 1, 1976.

Gary E. Lowe, Rogers, Field, Gentry, Benjamin & Robertson, Kansas City, for appellant.

Ralph O. Wright, Gary W. Collins, Kansas City, for respondent.

Before TURNAGE, P. J., and WELBORN and HIGGINS, Special Judges.

ANDREW JACKSON HIGGINS, Special Judge.

Appeal from judgment for plaintiff for $5,636.75 following jury-waived trial on allegation that defendant negligently damaged certain swivels "by incorrectly conducting the heat treatment of said swivels." The questions are whether plaintiff made a case on the issues of negligence and proximate cause, and whether two of plaintiff's witnesses were qualified as expert witnesses to give opinions on the issue of causation. Affirmed.

Timothy P. Kimsey is the vice president of plaintiff Kim Manufacturing, Inc. He earned a Bachelor of Science degree from Regis College in 1963. His major was mathematics and he had courses in physics, science, and metallurgy. In his ten years with Kim he had worked as general plant manager and in purchasing, design, engineering, and sales. Metal is Kim's principal fabricated product, and Mr. Kimsey had to know actual physical properties of metal with respect to hardness and capacity for machining.

The subject matter of the case is a hydraulic or high-pressure swivel which Mr. Kimsey designed. It has been used in hydraulic hoses in the car-wash business since 1971. Each swivel consists of a barrel and plug manufactured from type 410 stainless steel obtained through Jorgenson Steel Company and shipped directly to Manning Metal Products for machining to a tolerance not to exceed .002 inches. Upon completion of the machining, Kim takes the parts to a heat treater for hardening. Kim had used Metallurgical, Inc., for this process in the past but, in this instance, they were overloaded. Mr. Kimsey called defendant Superior Metal Treating, Inc., and spoke to Layton Redman, its president, to determine whether Superior heat treated type 410 stainless steel. Mr. Redman replied that he was familiar with type 410 stainless steel, and they agreed that Superior would heat treat a quantity of Kim's swivels to "maximum hardness in the range of 40 to 42" on the Rockwell C Scale. Heat treating deposits a film on the surface of the metal parts, and Mr. Kimsey explained that the next process would be to polish the parts to look nice for sale, and that they would have to fit together.

After the quantity of swivels had been heat treated by Superior, they were received by Kim for delivery to the A Luster Company for removal of "a tightly adherent greenish-brown scale on the surface of the material so that it would look shiny and silver and would be a salable piece of merchandise." A Luster employed an electropolishing process for this purpose which does not affect operation of the swivel. Prior to the delivery to A Luster, Junior Barber, Kim's plant manager, inspected the parts en route to A Luster and reported that they appeared different in coloration from the material that had been heat treated formerly at Metallurgical.

After the parts had been delivered to A Luster for electropolishing, the A Luster plant manager called Mr. Kimsey to report that the parts were not cleaning up properly, that there was some deep pitting on the surface of the metal, and that they would try processing them a second time to see if they would clean up. A Luster kept the parts for another week and attempted to clean them. Upon redelivery to Kim, Mr. Barber reported that they would not work, would not fit together, were too loose,

looked like coarse sandpaper, and were not salable.

After repeated efforts by Mr. Kimsey to talk to Mr. Redman at Superior, Superior's plant manager came by, looked at the damaged parts, and said it was not their problem.

Over defendant's objection going to Mr. Kimsey's qualification as an expert, Mr. Kimsey was permitted to and did testify that the defective condition of the swivels was caused by the heat-treating operation; that it was not caused by the electropolishing operation; that he was familiar with both operations; and that when an atmosphere in a furnace is not properly balanced you get a pitting and scaling on the surface of the heat-treated material; that in electropolishing, you cannot polish down in the bore of the parts because there is no way to get in there to polish it, and that physical examination of the parts satisfied him the cause of the damaged condition was a defective heat-treating operation.

Arthur Manning, Jr., of Manning Metal Products was familiar with the machining they did for Kim on the type 410 stainless steel obtained by Kim from Jorgenson Steel Company. He had been with the company for over 20 years, had worked with metals for about 80% of the time, was a member of the Society of Metal Engineers and was familiar with the processing of Kim's swivels from manufacture through the heat treatment and electropolishing processes. Over defendant's objection that Mr. Manning was not qualified as an expert, he was permitted to and did testify that the swivels were damaged because "they had been left in the tanks too long. Q. What kind of tanks are you talking about? A. The electro—THE COURT: I didn't hear that. A. We do some etching in our plant on different material. Q. Now you're saying that that is what causes the appearance here (indicating)? Would that cause the tolerances to be any less? A. Yes, if left that would be the way the material—Q. And it wouldn't be in the heat-treating of it? A. It could be in the heat-treating too. I don't

know all the processes they go through in the heat-treating."

On cross-examination, Mr. Manning testified that the defects could have been caused by both the electropolishing process and the heat-treating process, "but I believe it was caused by heat-treating because the electro thing—I don't believe it would change the dimensions. * * * they left it in the furnace too long."

Junior Barber, shop superintendent at Kim, received the alleged defectively heat-treated materials from Superior and delivered them to A Luster, noted the discoloration in comparison to similar parts he had seen after heat treating by other companies, and reported his observation to Mr. Kimsey.

Gordon E. Gross, a physicist and manager of the material services section at Midwest Research Institute, gave his expert opinion that the defective condition of the swivels in question was caused "from an erratic protection of the surface by an oxide, similar to the green oxide that was visible inside this piece. That oxide, while it appears to be continuous, of course, isn't really so, it doesn't have uniform strength, and as a result the electrochemical attack on it is irregular resulting in a rough surface or pitting. The oxide film that is in there is the usual product of heating in an atmosphere which provides oxidation. This could be air, it could be oxygen, but normally a person wouldn't let pure oxygen in anyway, but it could be any atmosphere that provided oxygen, including water vapor. The result simply is a surface that won't etch uniformly."

On cross-examination, Mr. Gross testified, "The kind of pitting we see here doesn't look like the kind of pitting that would occur from the heating. It looks like pitting that would occur from the erratic protection of a scale, but the pitting itself occurring at the time of electropolishing. Q. In other words, what you're saying is what you found on this, as far as the pitting, occurred probably during the electropolishing stage? A. During that time, right, as a result of the scale. Q. In other

words, the pitting that you found didn't occur during the heat-treatment process. A. That would seem to be the case. Q. It did not occur during the heat-treating process? A. That would seem right."

On redirect examination, Mr. Gross testified that "The pitting here is caused by the erratic attack of the electropolishing, as a result of the scale. In other words, the scale protects the metal surface in certain areas. Weaker points and fissures in the scale allow the electropolishing attack to occur nonuniformly. The result then is pitting. * * * The scale is the cause in essence of the pitting. In other words, given scale then electropolish then pitting. * * * the only cause that we're aware of of this kind of scale is heating in an oxidizing atmosphere. This is a reasonably heavy, although it's not a very tough scale, it breaks and shatters off very easily, it can be picked off very easily. It is very thin, a thousandth of an inch thick or less perhaps. It's enough to protect and give an erratic start on the electropolishing. * * * Q. And that's because of the heat treatment and not the electropolishing? A. Right. That seems definitely the case that the film is a result of oxidation during the heat treatment, right."

Layton T. Redman founded Superior Metal Treating, Inc., in 1954, and was its president. He had been involved in the metal-treating business since 1942 and previously had worked for Remington Arms and Armco Steel as acting plant metallurgist in charge of heat treating. He described Superior's heat-treating equipment, its operation, and the steps taken to maintain a proper atmosphere in the furnaces. He discussed Kim's order with Paul Wallace and Glen True, Superior's plant metallurgist and plant manager. Mr. Wallace had obtained the specifications for Rockwell hardness from Mr. Kimsey. He stated that the atmosphere during Superior's heat treating of Kim's swivels had been correct; that there was no way for anything to have gone wrong with the furnace that day. It was his opinion that the pitting and damage of Kim's swivels could not have occurred at

Superior's plant during the heat-treating process, and that the condition was caused by an acid attack during the polishing process.

Glen R. True took the order for heat treatment of Kim's swivels, specified how it was to be run at Superior, and examined the materials after treatment and before they left Superior. Mr. True felt that the heat-treatment processing of Kim's materials had been normal and he passed the parts as to quality control so they could leave the plant.

David Sparks was the heat treater's helper at Superior. According to him a 1700° temperature was normal for the Kim job and the prescribed procedure had been executed in accordance with the work order including a steady 1700° temperature.

Alfred Brown, an employee of Superior for seven years, "Rockwelled" random parts after the heating and tempering process and stated that maximum hardness for type 410 stainless steel had been reached. He also felt the greenish-blue color of the parts was normal, and he knew of nothing unusual with respect to the parts upon completion of the job.

Paul B. Wallace had a degree in metallurgy from the University of Notre Dame and 20 years' experience in metallurgy, including employment with Metallurgical, Thiokol Chemical Company, and the Ballistics Missile Agency. He took the order in question from Mr. Kimsey, acknowledged the specifications of desired hardness, and described the process used including the 1700° temperature and oil quenching, the latter for maximum hardness. In his opinion, the greenish-blue film upon completion of Superior's process was normal, and that the pitting and shrinkage of the swivels were due to excessive pickling and could not have been caused by any process undertaken by Superior.

Kenneth E. Rose, Associate Dean of Engineering at the University of Kansas, had a degree of Metallurgical Engineer from Colorado School of Mines, and a Master's degree in metallurgy from Cornell University. He also was a member of several

professional societies, a textbook writer, and a professional engineer. He examined certain of the parts in question. It was his opinion that the damage was caused by electrochemical attack; and that the parts had been properly hardened by Superior, and that it would not have been necessary, if the "pickling" operation had been undertaken properly, to remove as much material as had been removed by A Luster. Mr. Rose also acknowledged that if the heat-treating process left a greenish chrome oxide film as evidenced by the damaged parts, it meant that there had been a reaction with air or water in the process.

Appellant contends the court erred in entering judgment for plaintiff in that: (I) plaintiff failed to establish that defendant "negligently damaged plaintiff's material"; and (II) the evidence established that damage to plaintiff's material was not caused by the heat-treating process undertaken by defendant but rather was caused by the electropolishing process which occurred after the material was removed from defendant's plant and which was undertaken by A Luster Company.

■ Actionable negligence involves existence of a duty on the part of defendant to protect plaintiff from injury, failure of defendant to perform the duty, and injury to plaintiff resulting from the breach of that duty. *Nichols v. Blake*, 418 S.W.2d 188, 191 (Mo.1967); *Schaefer v. Accardi*, 315 S.W.2d 230, 233 (Mo.1958).

Appellant asks how defendant breached any duty it owed to plaintiff so as to cause injury to plaintiff. Appellant asserts the sole duty defendant had was to heat treat plaintiff's parts to the requested maximum hardness and that it did so.

■ Appellant's position does not question that plaintiff's swivels were damaged and that plaintiff sustained injury as a result; and there is evidence to establish defendant's negligence and that it caused plaintiff's damage and injury.

Mr. Kimsey gave an expert's opinion that the damaged condition of the swivels was caused by the heat-treating operation and not the electropolishing process, due to an unbalanced atmosphere in the furnace. Mr. Manning also gave an expert's opinion that the damaged condition was caused by heat treating because he did not believe the electropolishing process would change dimensions of the material. In his opinion, defendant left the material in the furnace too long. Mr. Gross was also of the expert opinion that the damaged condition was caused by the heat treatment and not the electropolishing. In arriving at that opinion, he explained that faulty heat treatment produces a scale which causes subsequent electropolishing of the surface to occur nonuniformly resulting in defects manifested by pitting. " * * * the only cause that we're aware of of this kind of scale is heating in an oxidized atmosphere." These opinions were confirmed in part by defendant's witness Rose. In addition, Mr. Barber noted the difference in physical appearance of the parts heat treated by defendant in comparison to similar parts heat treated by other companies on previous occasions.

■ Appellant emphasizes the testimony of defendant's president, Mr. Redman, its plant metallurgist, Mr. Wallace, and its primary expert, Mr. Rose, and questions the familiarity and knowledge of plaintiff's witnesses with respect to the matters upon which they testified. The resolution of any conflicts in the evidence, thus presented, as well as the credibility of all witnesses, were matters peculiarly within the province of the trier of fact. Rule 73.01, V.A.M.R.; *Shute v. Prom Motor Hotel, Inc.*, 446 S.W.2d 137, 141 (Mo.App.1969).

Appellant contends (III) that the court erred in admitting opinion testimony on behalf of plaintiff from Timothy P. Kimsey and Arthur Manning on causation "when in fact said witnesses were not qualified as expert witnesses to give opinions as to causation."

■■ An "expert witness" is one who by reason of education or specialized experience possesses superior knowledge respecting a subject about which persons having no particular training are incapable of

**429**

forming an accurate opinion or of deducing correct conclusions. *Giambelluca v. Missouri Pac. R.R. Co.*, 320 S.W.2d 457, 463 (Mo. 1959). Admission of expert testimony is a matter within the discretion of the trial judge and the exercise of the judge's discretion should not be upset absent abuse. *Butcher v. Main*, 426 S.W.2d 356, 359 (Mo. 1968).

 The qualifications of Mr. Kimsey and Mr. Manning, previously stated in connection with their testimony, demonstrate an ample basis for receipt of their opinions.

Judgment affirmed.

All concur.