Peter TERRY, Petitioner,

v.

NATIONAL TRANSPORTATION
SAFETY BOARD, Respondent.

No. 78–1422.

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 14, 1979.

Decided Oct. 25, 1979.

J. Scott Hamilton, Denver, Colo., for petitioner.

Douglas N. Letter, Washington, D. C. (Barbara Allen Babcock, Asst. Atty. Gen., Ronald R. Glancz, U. S. Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The petitioner, Peter Terry, seeks a reversal of an order of the National Transportation Safety Board which suspended his commercial pilot's certificate for 90 days. Terry allegedly violated Federal Aviation Administration regulations, 14 C.F.R. 91.-79(c)[1] and 14 C.F.R. 91.9.[2] Terry appealed to the National Transportation Safety Board from the FAA order which revoked his certificate on the ground generally that he had flown at dangerously low altitudes.

Following an evidentiary hearing, the National Transportation Safety Board,

---

1. § 91.79 *Minimum safe altitudes; general.*
Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:
  (a) Anywhere. An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property, on the surface.
  (b) Over congested areas. Over any congested area of a city, town, or settlement, or over any open air assembly of persons, an altitude of 1,000 feet above the highest obsta-cle within a radius of 2,000 feet of the aircraft.
  (c) Over other than congested areas. An altitude of 500 feet above the surface except over open water or sparsely populated areas. In that case, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle or structure.

2. § 91.9 *Careless or reckless operation.*
No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

through an administrative law judge, found that Terry had violated the FAA regulations. The administrative law judge modified the FAA's revocation order by commuting the revocation and by imposing a 90-day suspension of Terry's certificate. The National Transportation Safety Board affirmed the administrative law judge's decision and denied Terry's petition for reconsideration.

The governing regulation is 14 C.F.R. 91.-79(c). It prohibits flights closer than 500 feet in relationship to persons, vehicles, vessels or structures.

14 C.F.R. 91.9 prohibits the operation of an aircraft in a careless or reckless manner so as to endanger the lives or property of others.

The order of the FAA revoked the certificate for violation of regulation 91.79(c) and 91.9. The FAA found also that he had violated 14 C.F.R. 91.79(a), which prohibits flight at altitudes not allowing for emergency landing without undue hazard. The cause was then appealed to the administrative law judge, who conducted an evidentiary hearing and found that the 14 C.F.R. 91.79(a) violation concerning failure to allow for emergency landing without undue hazard had not been proven. He found, however, that the other violations had been proven. Also he modified the FAA order so as to suspend Terry's commercial pilot's certificate for 90 days rather than to revoke it as had been ordered by the FAA. As noted, the National Transportation Safety Board adopted the administrative law judge's findings and affirmed the judge's sanction, i. e., the 90-day suspension order. The petition for reconsideration was denied and the stay of the suspension order pending appeal was granted.

We are called upon to decide two issues:

First, whether the findings of fact of the administrative law judge are supported by substantial, reliable and probative evidence.

Second, whether the sanction imposed by the Board was excessive and not in accordance with the Board's precedent and policy.

\* \* \* \* \* \*

In support of the charge that Terry had flown within 500 feet of persons or structures and had violated the FAA regulation in that regard, two eye-witnesses were called, Mrs. Butcher and Mrs. Dodd, both of whom resided in the Drayton Harbor area in the State of Washington. Also offered was the admission by Terry that he had been operating his aircraft in a manner which would allow him to signal a friend who also lived along the Harbor that he, Terry, was in the area.

From the diagrams which were admitted, it appears that Terry flew northwest across the southern edge of Drayton Harbor in the vicinity of the Butcher and Dodd houses. He then flew out over the Harbor, turned the plane around and flew back along the same path in the vicinity of the Butcher and Dodd houses. He then turned northeast and flew toward the airfield. Of course, the dispute here is factual and concerns how close he came to the houses.

Mrs. Butcher and Mrs. Dodd testified that they saw a plane fly very near their homes at approximately 5:45 on the evening of November 3, 1976. They, according to their testimony, were apprehensive that the plane would hit their homes. Terry does not directly challenge the testimony of these ladies. He argues that their testimony was vague and inconclusive and therefore does not constitute substantial evidence on the question of the flight path of the airplane.

Mrs. Butcher was first called to testify. She said that while she was sitting in her home she saw lights out the window and assumed that what she saw there was either an airplane or a helicopter. She said that the plane was headed straight for her neighbor's house and that it was low. Mrs. Butcher said that "distances elude me," but that in relationship to the neighbor's home, which was in the path of the airplane, the plane was flying very low. The next morning she looked at the power poles and concluded that the plane must have been slightly higher than the poles. Otherwise, it would have hit them. She opined that the plane was about 50 feet off the ground.

The plane cleared the Dodd carport and then headed toward the Harbor, where it turned around and began its second pass. She was asked whether she was concerned about the proximity of the plane and the Dodd house on the second pass. She said that it was higher on the second pass, but that she was concerned for her safety at that point because it looked as if it were heading straight for the porch. She grabbed her children, who were on the porch, and ran through the house to the back yard as a result of what she had seen.

On cross-examination, Mrs. Butcher testified that she did not hear the plane and she was unable to recall what color the lights were. She concluded that he must have been somewhat higher than the poles. Had he not been, he would have collided with the wires. She observed lights on the understructure of the airplane when it passed over the Dodd house. She assumed that it flew right over the Dodd house because of the fact that the Dodd house was lit up and the airplane could be seen clearly going by.

Mrs. Butcher said that the distance between the shoreline and the house was 160 feet. From this testimony the inference is possible that the aircraft flew within 500 feet of persons or structures in violation of 14 C.F.R. 91.79(c). Mrs. Butcher's concern that the plane would hit the Dodd house and her own house together with her knowledge that the plane was very near the power poles supports the inference that the plane passed within 500 feet of the Butcher home and the Dodd home. Her statement that the plane was within 100 feet of the surface was referring to a point at which the plane was laterally very near or directly over either her house or the Dodd house.

Mrs. Dodd's testimony is more general than Mrs. Butcher's. She was sitting in the family room of her home, which is located along the edge of Drayton Harbor near the Butcher home, when she heard an aircraft which sounded "closer than most planes that fly over sounded." The plane flew over a field near her house. She could not make an estimate of the altitude of the aircraft but remembered "Thinking to myself I don't know how he's missed those lines." She stated that she assumed that the plane was very close to the power lines and estimated their height at 30 feet. She said further that she flipped her outside driveway lights off and on after the airplane turned around over the Harbor and started back toward shore. When she was asked why, she stated "I figured if he was coming over my house, I wanted to make sure he saw those lights and knew that there was a house." She was asked by counsel for petitioner where the aircraft was in relation to lateral distance from the house at the time that she had seen it. Her answer was that she was unable to judge it, but that it was not over her lawn, but, rather, was over a field. Later, she said that the plane was over her yard.

\*    \*    \*    \*    \*    \*

Terry relies on what at first glance appears to be an inconsistency in Mrs. Dodd's testimony. He claims that this should undermine her other statements. On direct examination, Mrs. Dodd testified that she had watched the plane from outside her house. She testified that she went back into the house when the plane was overhead and said that she didn't remember whether it was directly overheard. She did say, however, that "I figured if he was coming over my house, I wanted to make sure he saw those lights and knew that there was a house." In support of his contention that it was an inconsistency, he points to the question on direct examination as to where the aircraft was "in relation in lateral distance on the side from your house at the time you saw it?" This was clarified, and so it was asked "How far away was it from you, not high, but to the side?" She said "I can't judge. It wasn't over our lawn, which goes out maybe 20 feet, but it was instead over the field." Counsel for Terry on cross-examination asked her whether she had said that the plane was not over her yard and was over the field. She denied this and clarified it by saying that "Well, he was coming from towards the field, but he was over our yard, the side of our yard, the plane was."

The Administrator maintains that this statement is not contradictory and contends that she was describing the plane at different points in time as it passed across the field of vision. We can only say that it is unclear from the questions and answers whether she was referring to different views of the plane. However, we do not see it as any self-contradiction or as having the effect of discrediting her testimony.

Mrs. Dodd and Mrs. Butcher were, of course, the only eyewitnesses. The other witnesses were a local policeman, W. R. Quaade, and a Mr. Donald Paul, who was the General Aviation Operations Inspector. The latter witness gave the opinion that flying an aircraft with passengers during dark hours at about 50 feet above the surface over buildings or persons was careless and reckless.

Mr. Terry took the stand and conceded that he had flown the plane as low as 200 feet, but that this was out over the water. He denied flying within 500 feet of any person or structure.

\*      \*      \*      \*      \*      \*

The administrative law judge concluded that the evidence of Mrs. Butcher and that of Mrs. Dodd was credible and reliable, and found further that Terry was in fact illegally close to both the Dodd and the Butcher homes. He said that both of the eyewitnesses gave their actions and impressions in a normal and convincing manner and omitted details when they had no such knowledge. The judge found that the preponderance of the evidence establishes the § 91.-79(c) charge and that this violation "carries with it some lack of care and it follows, then, that the 91.9 charge also stands proven, as a residual charge."

The cause was appealed to the National Transportation Safety Board and that body affirmed the administrative law judge. It adopted his findings as its own and approved the modification which he made.

■ The circumstances support the determination of the administrative law judge that Mrs. Butcher and Mrs. Dodd were truthful. We refer to the fact that they called a neighbor and the fire department; that Mrs. Butcher ran from the house with her children. These basic facts, together with the blinking of outside lights as a warning, attest to the truth of the statements that the plane was threateningly low.

It is true that both Terry and his wife testified that the flight path did not take the plane within 500 feet of the Butcher and Dodd homes. They testified regarding their familiarity with the Drayton Harbor area and their ability to clearly see the water and the shoreline. The judge gave full consideration to their testimony and rejected it insofar as it attested to the fact that the plane did not descend to a level below 500 feet of the Butcher or Dodd homes.

\*      \*      \*      \*      \*      \*

The Federal Aviation Act of 1958, as amended, 49 U.S.C. § 1486(e), sets forth the standard to be applied by the finder of fact, and that is that the findings must be supported by substantial evidence. Also, the Administrative Procedure Act, 5 U.S.C. § 706, requires that the reviewing court shall hold unlawful and shall set aside agency findings which are unsupported by substantial evidence. In our judgment there is substantial evidence in support of the administrative law judge's decision.

■ The final question is whether the sanction imposed by the Board was excessive. Unquestionably, Terry was shown to be an experienced pilot and is dependent upon his pilot's certificate as a means of livelihood. Ninety-five percent of his income derives from this source. He contends that he will suffer extraordinary hardship if his certificate is suspended for 90 days.

The evidence shows that Terry had been previously found guilty of violating a Federal Aviation safety regulation. On that occasion he received a 20-day suspension for allowing a sky diver to jump from his aircraft without first ascertaining whether the jumper's parachute was inspected and repacked within the time limit required by

the regulations. In that instance the sky diver was injured fatally. Failure to inspect was not the cause, however. The administrative law judge in that case said that the violation was more of an administrative oversight than it was Terry's actions or qualifications as a pilot. The case at bar on the other hand does not present a merely technical violation.

Terry has cited cases which show that the 30-day suspension sanction has been imposed frequently for low flying. On this the administrative law judge said:

> [I]t bears repeating that this case is not far different from many other low flying cases here and decided by this Administrative Law Judge. In most first-offense cases the sanction of 30-days' suspension was imposed. Adding to this, the prior violation factor and considering numerous precedent decisions in the low flying field, particularly the *Robinson* case [1 NTSB 739, in which a commercial pilot with a history of two prior violations was given a 90-day suspension for low flying], it appears that a 90-day suspension here would suffice to meet the needs of aviation safety and at the same time be fully in line with precedents.

Defendant-appellee counters that the conduct on the part of Terry was deliberate. He flew quite low over an inhabited area for a purpose that had no great value in relationship to the risk involved. He had passengers in the airplane. He made the passes in darkness and could have collided with power wires. He did not stop at making one flight across the occupied area, he came back for a second one. Finally, it was observed that he was licensed as a professional pilot and his responsibility is commensurate therewith and hence he ought not to escape without fully realizing that he subjected persons to risk of harm.

The Supreme Court has held that the court of appeals generally is limited in the scope of review in this kind of a case, and it should not overturn a sanction unless it is "unwarranted in law or without justification in fact." *Butz v. Glover Livestock Commission Co.,* 411 U.S. 182, 93 S.Ct. 1455,

36 L.Ed.2d 142 (1973). The fact that its severity is more or less than sanctions which have been imposed in other cases does not render it unwarranted in law or without justification in fact.

The agencies exercise a broad discretion in imposing sanctions. *Nadiak v. C. A. B.,* 305 F.2d 588 (5th Cir. 1962), *cert. denied,* 372 U.S. 913, 83 S.Ct. 729, 9 L.Ed.2d 722 (1963); *French v. C. A. B.,* 378 F.2d 468 (10th Cir. 1967).

Finally, the question of sanction was given careful scrutiny at every level, and the 90-day suspension was, it will be remembered, imposed by the administrative law judge. It represented a reduction from the revocation sanction by the FAA. The 90-day suspension should not then be disturbed. A downward modification of this by this court would be inappropriate.

We affirm.