**Lula Mae ALLNUTT et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 76–CV–153–C.**

United States District Court, W. D. Missouri, C. D.

Oct. 7, 1980.

Richard S. Brownlee, III, Jefferson City, Mo., for plaintiffs.

Robert E. Larson, Asst. U. S. Atty., Kansas City, Mo., for defendant.

## OPINION AND ORDER

ELMO B. HUNTER, District Judge.

This is an action for wrongful death. Plaintiffs are Lula Mae Allnutt and her children. They are the survivors of Lloyd E. Allnutt, Jr., who was killed when the small airplane he was piloting struck power transmission lines over the Osage River in central Missouri. Plaintiffs are seeking approximately $500,000 in damages. Defendant is the United States. Federal jurisdiction is premised upon the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. and 28 U.S.C. § 1346(b). The complaint was timely filed pursuant to 28 U.S.C. § 2401.

Full trial of this matter was held in Kansas City, Missouri, from July 21, 1980 through July 23, 1980.

### I.

In order to fully develop the issues presented in this complex action, it is necessary to explore the relevant factual posture of this case as revealed by the joint stipulation of facts, the testimony and the documentary evidence that compose the record before this Court.

On February 10, 1975, the decedent was hired to pilot a 1974 model Piper aircraft in the mid–Missouri region. His services had been retained by the "Eagle Project" which was an on–going study funded by the United States Government to research the ecology of eagles wintering in Missouri with an emphasis on eagle–waterfowl relationships. The Eagle Project was being carried out by a team composed of representatives from the University of Missouri, the Bureau of Sport Fisheries and Wildlife of the Fish and Wildlife Service, U.S. Department of the Interior, and the Missouri State Conservation Commission. With decedent on February 10, 1975, was Ms. Judith Southern who was a Ph.D. candidate at the University of Missouri and Mr. Terry G. Wilson who was a temporary employee of the Missouri Conservation Commission.

The purpose for the flight was to track the movement of bald eagles which had previously been equipped with electronic transmittors. Prior to February 10, 1975, Ms. Southern had made three such flights with the decedent. On the morning of February 10, 1975, Ms. Southern, Mr. Wilson and the decedent flew from the municipal airport at Chillicothe, Missouri, to the E. W. "Cotton" Woods Memorial Airport at Columbia, Missouri. Next, the threesome flew to Memorial Airport at Jefferson City, Missouri. Following lunch, the three reboarded the airplane and flew to the Osage River. The pilot was conducting low level "contact" flying up the Osage at an altitude of approximately 100 feet at approximately 100 miles per hour. At mile 23.2 of the Osage River, the aircraft struck four power lines owned by the Three Rivers Electric Cooperative, Inc. ("Three Rivers power line"), that crossed the river at that point.[1]

1. There was some controversy in the record regarding the exact height of the Three Rivers power line, but no party to this action asserts that, at its highest point, the power line was higher than 200 feet. See plaintiffs' Post Trial Brief at p. 6 which indicates that the power line was approximately 175 feet at the highest point.

The aircraft crashed into the water and all aboard were killed.

The evidence established that it was the decedent's usual practice to review aeronautical charts prior to piloting an aircraft and to use such charts during flight. See test. of Lula Mae Allnutt and Mr. Blackie Reed, who was the operator of decedent's employer–Reed Aviation–and a pilot. The chart that the decedent used on February 10, 1975 was entitled "Kansas City Sectional Aeronautical Chart, Lambert Conformed Conic Projection, Standard Parallels 33° 20′ and 38° 40′ topographic date corrected to October 1974–13th Edition." ("Chart 13"). See test. of Mr. Reed. The parties stipulated and the evidence clearly established that the Three Rivers power line that the decedent struck was not depicted on Chart 13.

Plaintiffs' theory of liability in this case is relatively simple. They contend that the United States, acting through the Commerce Department, and its sub–agency, the National Oceanic and Atmospheric Administration, Office of Aeronautical Charting and Cartography, Aeronautical Chart Division ("ACD"), was negligent in failing to depict the power transmission line on Chart 13 thereby causing decedent to rely to his detriment on said chart.

The defendant argues that plaintiffs' theory fails on a number of grounds. First, defendant contends that the acts of the officials of the ACD fall within the discretionary function exception to the Federal Tort Claims Act, and are, therefore, immune from suit. Second, even if the discretionary function exception does not apply, defendant maintains that it was in complete conformity with the established specifications for inclusion of obstacles on sectional aeronautical charts, and as such, was not negligent in the preparation of Chart 13. Third, defendant asserts that its acts in omitting the power line were not the proximate cause of decedent's accident because decedent could not have been relying on Chart 13 while flying at the 100 foot altitude. And fourth, even if defendant was negligent in failing to include the Three Rivers power line, decedent was contributorily negligent in operating the aircraft in a careless and negligent manner.

## II.

### THE DISCRETIONARY FUNCTION EXCEPTION

The threshold question that this action presents is whether the discretionary function exception to the Federal Tort Claims Act bars suit against the defendant.[2]

There is a substantial body of case law interpreting the discretionary function exception. See, Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957); Downs v. United States, 522 F.2d 990 (6th Cir. 1975); Griffin v. United States, 500 F.2d 1059 (3rd Cir. 1974); Dahlstrom v. United States, 228 F.2d 819 (8th Cir. 1956); Reminga v. United States, 448 F.Supp. 445 (W.D.Mich.1978). The traditional inquiry for determining if the discretionary function exception applies is an analysis of whether the particular act of a government agent is one involving the formulation of government policy or whether the act in question occurs in implementing a policy at an "operational" level. See, e. g., Dahl-

2. 28 U.S.C. § 1346(b) affords a federal court forum involving actions

... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

And, 28 U.S.C. § 2680(a) imposes a limitation on claims

... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*strom v. United States, supra,* 228 F.2d at 822–23; and *Downs v. United States, supra,* 522 F.2d at 996–97. The judicial interpretations of this distinction provide no clear standards for determination of the applicability of the discretionary function exception. Rather, the judicial constructions of 28 U.S.C. § 2680(a) have tended to examine all relevant factors in an assessment of whether the act in question was at a policy making level which Congress intended to place beyond judicial review or at the functionary or operational level which was intended to be reviewable. *See, Downs v. United States, id.,* 522 F.2d at 997; and *Sami v. United States,* 617 F.2d 755, 765–68 (D.C.Cir.1979).[3]

Neither party to this action maintains that the government had no policy for the inclusion of power transmission lines on Chart 13.[4] Indeed, the evidence adduced at trial clearly demonstrated the existence of established specifications for the production of sectional aeronautical charts. While the evidence established the existence of specifications, there was some controversy over what specifications were in use when Chart 13 was prepared.[5]

Plaintiffs argue that the standards for inclusion of power transmission lines are derived from many sources. Specifically, plaintiffs identified numerous policy sources that they claim controlled the production of Chart 13:

1.) "United States Government Specifications for Sectional/Tactical Pilotage Aeronautical Charts" prepared by the Inter–Agency Air Cartographic Committee ("IACC Specifications"), see defendant's exhibit 12;

2.) Guidelines and Policy for Transmission Line Depiction on Aeronautical Charts ("Transmission Line Guidelines"), see plaintiffs' exhibit 9;

3.) Chapter 3A5 of the United States Geological Survey's Topographic Instructions, Book No. 3 ("U.S.G.S. Topographic Instructions"), see plaintiffs' exhibit 10;

4.) Army Map Service Technical Manual 45, Chapter 9, ("Army Map Service Manual"), see plaintiffs' exhibit 11.

5.) United States Department of Agriculture Photo Index,[6] see plaintiffs' exhibit 29.

While substantial confusion arose during discovery in this action over the applicable standards,[7] the overwhelming weight of highly credible testimony produced at trial leads this Court to the conclusion that only the IACC specifications governed the pro-

---

**3.** For an *exhaustive* study of the checkered judicial history of the discretionary function exception, see *Blessing v. United States,* 447 F.Supp. 1160, 1167–86 (E.D.Pa.1978).

**4.** See Post Trial Brief of defendant at pp. 13–19; Post Trial Brief of plaintiffs at p. 5.

**5.** See test. of Mr. Walter J. Chappas, Associate Director, Office of Aeronautical Charting and Cartography, National Ocean Survey, National Oceanic and Atmospheric Administration, United States Department of Commerce; Mr. Stephen Yachmetz, Jr., formerly the Chief of the Aeronautical Chart Division, United States Department of Commerce, now retired; Mr. Sidney Feldman, formerly the Assistant Chief of the ACD, United States Department of Commerce; Mr. Frank McDermott, aviation consultant, McClean, Virginia; and Defendant's exhibit 12.

**6.** In their Post Trial Brief, plaintiffs appear to argue that the Agriculture Department's Photo Index was a policy source for the rules governing the inclusion of power transmission lines on aeronautical charts. See, plaintiff's Post Trial Brief pp. 8–9. The photo index is merely a composite aerial photograph of the region in question. While the index may have value as a data source and possibly demonstrating notice to the defendants, this Court was not shown that the photo index was used as a policy for the inclusion of power transmission lines.

**7.** See defendant's answer to plaintiffs' first interrogatory No. 12, wherein the defendant included the Transmission Line Guidelines (which document incorporates the standards for the Army Map Service Manual and the U.S.G.S. Topographic Instructions) in its response to plaintiffs' inquiry about the applicable standards; the deposition of Mr. Stephen Yachmetz taken April 28, 1980 in Bradenton, Florida; and plaintiffs' exhibit 18, which was a letter written over Mr. Yachmetz's signature stamp on December 3, 1974 that seems to indicate that the ACD does not use height as a criteria for placing power lines on aeronautical charts, which is directly contradictory to the IACC specifications.

duction of Chart 13. See test. of Messrs. Chappas, Feldman, Yachmetz, and McDermott.[8] Further, Chart 13 itself lends credibility to the defendant's position inasmuch as the face of the document reads as follows:

> "Published in Accordance with Inter–Agency Air Cartographic Committee Specifications and Agreement." See, Plaintiffs' exhibit 1.

As well, it was revealed that the Transmission Line Guidelines document was prepared by a Mr. Rexford Anderson following a meeting of ACD staff personnel on September 6, 1974. See defendant's exhibit 6D. Mr. Anderson testified that the Transmission Lines Guidelines was just an "idea" paper that he prepared in an effort to seek out new methods of approving the charting of power transmission lines. He testified that the only recommendation contained within Transmission Lines Guidelines that was adopted was the recommendation to change the color of powerlines on aeronautical charts from blue to black. According to Mr. Anderson, the references in the paper to the U.S.G.S. Topographic Instructions and to the Army Map Service Manual were merely suggested improvements that were never implemented.

Lastly, this Court notes that the IACC was formed in May, 1965, through a "Memorandum of Agreement" between the Federal Aviation Agency, the Department of Defense, and the Department of Commerce with the express goal to "... develop the *final* detailed and *authoritative* specifications for the actual flight information materials (both textual & chart forms) which will constitute the official operative manuals produced or used by Government agencies." (emphasis supplied) See defendant's exhibit 54.

Having determined that the IACC specifications controlled the production of Chart 13, this Court finds unpersuasive the de-fendant's argument that the cartographers in the ACD are involved in the "establishment of specifications". Plaintiffs' theory is that there was operational negligence within the ACD by cartographers who failed to include the Three Rivers power line over the Osage River in violation of the IACC specifications. Defendant cites the recent case of *Baird v. United States*, No. 78–4180 (D.Kan. filed Jan. 3, 1979), in support of its contention that the discretionary function exception applies. But, *Baird* differs from the instant action in the important respect that the IACC standards did not require the type of information that the plaintiffs alleged was necessary for air safety.

> "[Plaintiff] ... contends the United States should be held liable because the chart failed to inform him (1) that the longest runway at the Paul Windle Airport was not the lighted runway and (2) that the shorter runway had lighting on only 2,176 of its 2,580 feet ...
>
> The Court finds that the IACC specifications do not require or even suggest the Government should provide this information. No mention is made of a requirement that the longest runway shown be the lighted runway or that symbols be adopted and used to show a limitation on lighting other than the times of operation and general availability." *Baird v. United States,* slip op. at p. 6.

Thus, the thrust of plaintiffs' complaint in *Baird* was that the government through the IACC had failed to develop sufficiently comprehensive policies for inclusion of visual flight information. And the Court concluded that "[i]t would appear suit against the United States cannot be maintained on the claim that it failed to enact a more comprehensive set of air safety regulations." Id.

---

**8.** Mr. McDermott's testimony indicated that the numerous governmental sources listed above were all utilized in preparing Chart 13. While Mr. McDermott has a distinguished background in the field of air safety, he admitted on cross–examination that he is not a cartogra-pher and that he has never had any experience in developing specifications for the inclusion of items on aeronautical charts. Whereas, all of the defendant's experts–who had worked in the ACD prior to the accident–testified that only the IACC specifications governed.

■ Here, plaintiffs are not challenging the sufficiency of the IACC specifications. Rather, plaintiffs contend that the personnel within the ACD failed to properly adhere to the established IACC specifications in the preparation of Chart 13. As such, this Court finds that the discretionary function exception does not apply to the mechanical *preparation* of aeronautical charts when such preparation fails to conform to specific IACC standards or specifications. At such a basic level, there is no discretionary behavior in following the established IACC rules for inclusion of power lines on sectional aeronautical charts. *See generally, Reminga v. United States, supra; In re Air Crash Disaster Near Silver Plume, Colo.*, 445 F.Supp. 384, 402–404 (D.Kan. 1977).

### III.

### NEGLIGENCE

Jurisdiction having been established, this Court must now determine whether there was any operational level negligence in the preparation of Chart 13.

■ This Court initially observes that "[t]he United States has a duty, when publishing and disseminating aeronautical charts, to accurately represent those features it attempts to portray. Where such information is inaccurately and negligently indicated, and such negligence is a proximate cause of plaintiff's injuries, the government is liable for such damages as are caused." *Reminga v. United States, supra*, 448 F.Supp. at 460 (*citing Murray v. United States*, 327 F.Supp. 385 (D.Utah 1971); and *Sullivan v. United States*, 299 F.Supp. 621 (N.D.Ala.1968) *aff'd.* 411 F.2d 794 (5th Cir. 1969)).[9]

Plaintiffs argue that the applicable IACC specifications required inclusion of the Three Rivers powerline on Chart 13. In abbreviated fashion, the standards germane to this action read as follows:

Chapter 3 9. E. Replacement Page 107

(6) *Obstructions*

(a) all cultural features which extend 200 feet or more above surrounding terrain shall be considered as a "vertical obstruction".

*1* The obstruction symbol shall normally be shown for obstructions such as TV or radio towers, 200' or more above the terrain. Where several obstructions occur within close proximity one to the other, or within a limited area, only the values of the highest shall be shown with the group obstructions symbol. Minor obstructions which are not in critical locations shall be omitted in congested areas.

*2* Examples of features considered a hazard to low level flight are tanks, factories, lookout towers, smoke stacks and elevated features such as cables or pipelines crossing rivers or valleys. These are extremely important because of the hazard to low level flight and the vertical dimension which facilitates identification at a distance.

(b) Obstructions less than 200' in height should also be shown if the location is critical and chart congestion permits; for example, if the location on the ground is much higher than the surrounding terrain or very near an aerodrome.

Chapter 3 9. E. Additional Page 109–1

(7) *Power Transmission Lines*

(a) Power transmission lines, with pictorial pole (pylon) symbols, shall be shown on the chart to a density short

---

**9.** As a federal court determining liability in a Federal Tort Claim action, this Court must apply Missouri state law concepts of negligence. See, 28 U.S.C. § 2674; and generally, *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Boe v. United States*, 352 F.2d 551 (8th Cir. 1965); and *Garber v. United States*, 578 F.2d 414 (D.C.Cir.1978). In general, Missouri requires that to establish a case of actionable negligence, it is necessary to demonstrate that the defendant owed a duty to the plaintiffs, that the defendant breached, through act or omission, the duty, and that the plaintiff was thereby proximately injured. See, *Kim Mfg., Inc. v. Superior Metal Treating, Inc.*, 537 S.W.2d 424 (Mo.App.1976); *Hulahan v. Sheehan*, 522 S.W.2d 134 (Mo.App.1975); *Stevens v. Wetterau Foods, Inc.*, 501 S.W.2d 494 (Mo. App.1973).

of over–congestion. (Do not show within populated places.) Spacing (location of the pole symbol) is dependent upon the length of the power line: (1) Approximately one inch intervals on lines 3″ or less in length; (2) approximately 2″ apart on lines longer than 3″.

(b) Telephone and telegraph lines shall be shown only in exceptionally open country for landmark value, and across valleys and canyons because of the hazard presented to low flying aircraft.

As plaintiffs' arguments demonstrate, the foregoing specifications are susceptible of differing interpretations. See plaintiffs' Post Trial Brief pp. 5–7; also see test. of Mr. McDermott. Nevertheless, the testimony of the persons most familiar with the administrative construction of these IACC specifications presented a consistent view that power lines are only included 1.) if they have landmark value, and/or 2.) if they are above 200 feet in height thereby becoming an obstacle. See test. of Messrs. Chappas, Feldman & Yachmetz.

This Court does acknowledge that this interpretation of the IACC specifications does not seem to be comprehensive in light of the language of the IACC specifications on power lines and obstructions. For instance, Chapter 3 9. E. (7) sub–part (b) appears to suggest two separate standards for inclusion of power lines–those in open country for landmark value and those crossing valleys and canyons because of the hazard to low flying aircraft. Plaintiff urges such a literal interpretation of this sub–part. But, this Court observes that none of the IACC specifications–and perhaps this

sub–part in particular–are paragons of regulatory draftsmanship. While sub–part (b) appears under the general heading "Power Transmission Lines", read literally, sub–part (b) applies only to *telephone* and *telegraph* lines.

Further, Mr. Chappas testified that with regard to power lines crossing valleys and canyons, such lines are only included if the Federal Aviation Administration ("FAA") has deemed them to be a hazard to low level flight under FAA regulations. He stated that the FAA had not made such a determination regarding the Three Rivers power line. See also, "Declaration of Walter J. Chappas," ¶¶ 7 & 12, filed March 19, 1979.[10]

Plaintiffs also urge a construction of the obstructions section to require inclusion of the power line in question even though the power line was less than 200 feet in height. Plaintiffs argue that Chapter 3 9. E. (6)(b), which requires under certain circumstances that vertical obstructions of less than 200 feet be included on aeronautical charts, can be read in conjunction with (6)(a) so as to require inclusion. (6)(b) reads "obstructions less than 200 feet in height should also be shown if the location is critical and chart congestion permits." (6)(a)*1* reads ". . . minor obstructions which are not in critical locations shall be omitted in congested areas." And (6)(a)*2* reads "examples of features considered a hazard to low level flight are . . . cables or pipelines crossing rivers or valleys. These are extremely important because of the hazard to low level flight . . . ." Plaintiffs suggest that the location of the Three Rivers power line is critical because (6)(a)*2* places extreme importance

---

**10.** The testimony revealed that the FAA makes "hazard–no hazard" determinations on proposed structures that will be greater than 200 feet in height. The FAA does not investigate proposed obstructions; rather, it relies upon builders to submit notice of any proposed structure that will exceed 200 feet. After the FAA receives such information, it forwards it to the Department of Commerce for possible charting. See test. of Mr. McDermott and Mr. Duane Highland, Air Space Specialist for the FAA. Mr. Highland noted that the notice requirements only operated for proposed struc-

tures–not for existing ones. Further, he stated that this power line would not have required notice because it does not exceed 200 feet.

In response to questioning by the Court, Mr. Highland testified that the FAA was not aware of this particular power line. Also, Mr. Gilbert Hilkemeyer, manager of the Three Rivers Electrical Cooperative, testified that he was not aware of his firm ever having sent notice of this power line to the FAA or its predecessor agency, the CAA. And, Mr. Anderson testified that his search of the ACD obstructions file did not reveal any information on this power line.

on cables crossing rivers as hazardous to low level flight and that there would be no chart congestion to include this power line. Thus, plaintiffs interpret (6)(a)1 to mean that minor obstructions in critical locations shall be included in non–congested areas.

While ingenious, this Court is unable to accept plaintiffs' construction of Chapter 3 9. E. (6). The obstruction section is equally susceptible of the interpretation that all of sub–part (a) including sub–sub–parts 1 & 2 deal solely with obstacles of more than 200 feet in height; and that sub–part (b) fails to define the term "critical" which would leave such determinations in the realm of interpretive discretion. Nothing in the obstructions section suggests that the "extremely important" hazardous features listed (all of which presumably are in excess of 200 feet in height) are likewise examples of "critical" locations for purposes of interpreting (6)(b).

In sum, there is considerable slack in the language used in both Chapter 3 9. E. (6) and Chapter 3 9. E. (7). Confronted with such a situation, this Court must rely upon the traditional presumption in favor of an agency's interpretation of its own regulations. *See, United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *Murphy Oil Corp. v. Federal Energy Reg.,* 589 F.2d 944, 948 (8th Cir. 1978); and *Blue Cross Association, et al., v. Harris, et al.,* 622 F.2d 972 (8th Cir. 1979). As the Supreme Court noted in *Larionoff* when confronted with ambiguous regulations: "These regulations . . . contain a number of ambiguities. We need not tarry, however, over the various ambiguous terms and complex interpretations of the regulations. In construing administrative regulations, 'the ultimate criterion is the administrative in-

terpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " (*citing Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). Given the imprecise nature of the IACC specifications, this Court is unable to conclude that the "200 foot and/or landmark value" interpretation given to these specifications by all of the ACD officials is plainly erroneous or inconsistent with the specifications.

As the evidence has clearly established that the Three Rivers power line was below 200 feet in height, the question that next presents itself is whether this power line had any "landmark value".[11] The testimony on this subject was somewhat discordant. Mr. McDermott testified, although he is not a pilot or a cartographer, that the Osage River in the general area of the Three Rivers power line bends and twists a great deal necessitating the placement of some fixed structure for a navigational aid. In his opinion, the Three Rivers power line was clearly of landmark value. See also, test. of Mr. Reed.

On the other hand, Mr. Chappas testified after a careful review of numerous aerial and land photo exhibits [12] and the stipulation of the parties, that the Three Rivers power line was of no landmark value. He observed that from the air the line was practically invisible.[13] Similarly, Mr. Feldman testified after a review of the photo exhibits and the stipulation that this power line is "of no landmark value for charting purposes". His conclusion was based on an assessment of the relative obscurity of this power line from an aerial vantage point and that the riverbends and surrounding cultural features provided sufficient topographi-

11. The IACC specifications do not define the term; but according to the testimony, any surface feature that is useful for navigational purposes when flying according to visual flight rules (VFR) is something of landmark value. See test. of Messrs. McDermott, Yachmetz, Chappas, and Feldman; Also, see test. of Mr. Reed.

12. See defendant's exhibit Nos. 34, 35, 37, 38, 39, 41, 55, 59, 60, 61, 64, 66, 67, and 68.

13. After a thorough examination of the photo exhibits, this Court agrees that the power line is barely visible. Further, this Court notes that the cleared right of way for the power line likewise was lacking in significant definition for navigational assistance. See test. of Mr. Chappas.

cal landmarks. He specifically noted that each bend of the river has its own distinctive qualities and that railroad crossings and roads in the area all provided far superior landmark features for VFR flying.

Mr. Yachmetz offered what appeared to be equivocal testimony on the question of landmark value. During his pretrial deposition and during his examination as an adverse witness, he seemingly testified that *a* power line located in *a* rural area crossing *a* river such as the Osage could be of landmark value. See deposition of Mr. Yachmetz, p. 74, lines 9–15. But, in his testimony during the defendant's case, he clearly indicated his concurrence with the opinion of Messrs. Chappas and Feldman that *this* power line at *this* location was without landmark value.

Supporting defendant's position that this power line offered no landmark value was the testimony of Mr. Alan Hoffelman, Chief Pilot for the Missouri Conservation Commission. Mr. Hoffelman testified that local power distribution lines like the Three Rivers power line are of little use for navigation purposes because it is very difficult to see them unless the flight is conducted at a very low altitude. He stated that at 1000 feet, the lines would be unobservable, and hence of no practical use as an aid to navigation.

██ Based upon a careful assessment of the testimony, stipulations and documentary evidence offered on this issue, this Court is persuaded that the Three Rivers power line was of no landmark value for aeronautical charting purposes.[14] Thus, it is the conclusion of this Court that the defendant was not required within the terms of the applicable IACC specifications to include the Three Rivers power line on Chart 13.

Inherent within any legal analysis of the concept of negligence is the difficult question of the knowledge of the alleged tortfeasor. *See,* Prosser, TORTS § 32 pp. 157–

66; *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949); *Perringer v. Lynn Food Co.,* 148 S.W.2d 601 (Mo.App. 1941); *Beckman v. Kinder,* 237 Mo.App. 52, 165 S.W.2d 311 (1942); *DeMariano v. St. Louis Public Service Co.,* 340 S.W.2d 735 (Mo.1961); *Niemczyk v. Burleson,* 538 S.W.2d 737 (Mo.App.1976). This Court notes that defendant did not know of the Three Rivers power line at the time Chart 13 was prepared. *See* footnote 10, *supra.*

Mr. Chappas testified that the ACD receives landmark and obstruction information from numerous sources including the United States Geological Survey, the Defense Mapping Agency, the FAA, individuals, the Department of Agriculture, and flight edit checks of the Department of Commerce.

Regarding the latter, Mr. Chappas indicated that every five years a team from the Department of Commerce will fly over the area depicted on a sectional aeronautical chart. He testified that such a flight edit was performed for Chart 13 in June of 1973. The procedure followed was a flight on autopilot back and forth across the region with the flight team making pencil notations on an aeronautical chart regarding the location of indicated features as well as unindicated features. Defendant's exhibit 157 is the actual chart that was used during the flight check in June of 1973. It shows that the flight edit team flew within approximately five miles of the accident site. The team checked the bend on the Osage River at the location of the Three Rivers power line, but did not check the power line. There is no indication that they saw the power line or could have seen it.

Also, plaintiffs attempted to show at trial that defendants knew of the Three Rivers power line from the United States Department of Agriculture photo–index. Mr. Chappas indicated that he could barely see the "cut" through the trees for this power

---

14. In so concluding, this Court observes for descriptive purposes that Chart 13 graphically depicts an immense area extending from approximately Junction City, Kansas on the west to approximately St. Louis, Missouri on the

east and from approximately Fayetteville, Arkansas on the south to approximately Kirksville, Missouri on the north. See plaintiffs' exhibit 1.

line when specifically looking for it, but that the photo–index was never used as source data to locate power lines. He stated that the photo–index was used only to align data from the flight edit checks. See also, test. of Mr. Yachmetz.

■ Of course, Missouri law requires that ordinary care be determined in accordance both with known dangers and those which reasonably should have been anticipated under the circumstances. *See, Perringer v. Lynn Food Co., supra; Beckman v. Kinder, supra.* Plaintiff argues that the danger of power lines to low level flight was clearly recognized in the "requirements" section of the IACC specifications. See defendant's exhibit 12, Ch. 1 2. a. & b. This Court agrees that the risk of collisions with power lines is a clearly foreseeable danger in the preparation of aeronautical charts. Nevertheless, a "should have known" analysis would fail in this case in light of the defendants clear compliance with the relevant standards for inclusion in the IACC specifications. Even if defendant had known of the Three Rivers power line it would not have been negligent to have not included the power line. Thus, plaintiffs' contention that the defendant failed to gain adequate "information on power transmission lines in terms of their foreseeable hazard to low level flight" is without effect here. Therefore, the ultimate issue on the question of negligence at the operational level must be determined against plaintiffs.

## IV.

### CONTRIBUTORY NEGLIGENCE[15]

■ Even assuming, *arguendo*, that defendant was negligent in the preparation of Chart 13, this Court was presented with persuasive evidence of contributory negligence which is a complete barrier to recovery under Missouri law. *See, Hobbs v. Renick*, 304 F.2d 856 (8th Cir. 1962); *Chandler v. Mattox*, 544 S.W.2d 85 (Mo.App.1976).

Defendant raises essentially two theories for the application of a contributory negligence bar. First, defendant asserts that decedent violated 14 C.F.R. § 91.9 and § 91.79(c) in operating the aircraft at 100 feet over the Osage River. 14 C.F.R. § 91.9 provides:

"No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."

And 14 C.F.R. § 91.79(c) provides:

"Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:

(c) OVER OTHER THAN CONGESTED AREAS

An altitude of 500 feet above the surface except over open water or sparsely populated areas. In that case, the aircraft may not be operated closer than 500 feet to a person, vessel, vehicle, or structure."

With regard to 14 C.F.R. § 91.79(c), defendant offered the testimony of Mr. Davis to support the proposition that decedent

---

**15.** Defendant also argues, alternatively, that the alleged negligence of failing to include the Three Rivers power line could not have been the proximate cause of decedent's accident. Defendant asserts that decedent could not have been relying on Chart 13 while flying at 100 feet over the Osage River. See test. of Mr. Hoffelman and Mr. Ken Davis, General Aviation Specialist, of the FAA. Nevertheless, this Court is satisfied that decedent's usual course of conduct was to study the aeronautical charts prior to take–off and presumably decedent would have altered his flight plan on February 10, 1975, if the Three Rivers power line had been included on Chart 13. See test. of Mr. Reed and Ms. Allnutt.

Mr. Hoffelman and Mr. Davis testified that an experienced pilot would know that not all power lines would be depicted on a sectional aeronautical chart and therefore an overflight of the terrain would be in order before performing a low level flight. The record was not conclusive on this aspect of the reliance argument of defendant. It is unclear whether such an overflight was conducted or not. But, as plaintiffs' counsel points out, the relative invisibility of the Three Rivers power line may well have rendered an overflight procedure useless. As such, this Court feels that in light of all of the evidence on this question, the decedent was most likely relying on Chart 13, at least insofar as it seems improbable that such a low level mission would have been conducted but for the absence of some warning of the Three Rivers power line–either visually or on Chart 13.

violated § 91.79(c) by flying within 500 feet of a structure–in this case, the Three Rivers power line. *For comparison, see Blackwell v. Bond*, 619 F.2d 372 (5th Cir. 1980) (pilots' license suspension affirmed following flight under a bridge); *Terry v. National Transp. Safety Bd.*, 608 F.2d 418 (10th Cir. 1979) (pilot's certificate suspension affirmed following flight close to houses). Mr. Davis testified that in his opinion, decedent had a responsibility to avoid the power line by 500 feet even if he couldn't see it.

■ Whatever the merits of defendant's position, as plaintiffs indicate, a violation of a federal aviation regulation does not state negligence as a matter of law under the Missouri decisions. *See, Hough v. Rapidair, Inc.*, 298 S.W.2d 378, 383 (Mo.1957); *Bledsoe v. Northside Supply & Development Co.*, 429 S.W.2d 727, 731 (Mo.1968). It is to be considered along with all of the other evidence of negligence and proximate causation.

The balance of Mr. Davis' testimony, as well as that of Mr. Hoffelman–witnesses that this Court considered highly credible–more clearly established a lack of due care regarding a foreseeable risk on the part of decedent in flying at 100 feet over the Osage River. Both of these witnesses testified that an experienced pilot knows from training and experience that sectional aeronautical charts do not provide information on all power lines. Further, Mr. Davis testified that pilots are taught that they must always be aware of and stay above the "wire level". Mr. Davis defined this term

as any position during flight that would bring an aircraft into any area that could feasibly have wire strung across it–e. g. a valley or between river bluffs. Mr. Davis indicated that the risk of a "wire strike" at low altitudes is, among pilots, a well known hazard of low level flying. He offered his strong opinion that decedent's actions in flying an airplane along this sharply winding river at only 100 feet in altitude–an altitude below the "wire level"–constituted reckless and careless behavior endangering himself and the lives of his passengers.[16]

Plaintiff argues that decedent can not be held contributorily negligent for striking a wire that he possibly could not see. *See, Gulf, Mobil and Ohio Railroad Co. v. Larkin*, 307 F.2d 225 (8th Cir. 1962). This Court disagrees in light of the evidence. The stipulation indicates that decedent was a professional pilot with at least 6 years of flying experience totalling 3581 hours of flying time prior to the accident. Both Mr. Hoffelman and Mr. Davis are experienced pilots who testified that knowledgeable pilots are aware of the risks of power lines or other obstructions during low level flight. Plaintiffs offered no evidence to refute this testimony.[17]

■ Under Missouri law, determinations of contributory negligence are made on a case by case basis. *See, Elgin v. Kroger Grocery & Baking Co.*, 357 Mo. 19, 206 S.W.2d 501 (1948); *Arkansas–Missouri Power Co. v. Carl*, 280 F.2d 7 (8th Cir. 1960). All relevant circumstances must be carefully considered in an assessment of the fac-

---

**16.** While not considered as evidence of contributory negligence on the part of decedent because 14 C.F.R. § 91.3(a) secures all flying responsibility in the pilot, this Court observes that Ms. Southern was explicitly told three days before the accident by her project supervisor, Dr. Rollin Sparrowe, not to do low level flying. Dr. Sparrowe testified that he first learned of the fact that Ms. Southern had engaged in low level flying in past missions during the meeting he had with her three days before her death. He stated that he told her there was no reason for such low level flying because the signals being transmitted from the eagles could be received 10–20 miles away and that he told her the optimum altitude for re-

ceiving the signals was 2000 feet. He testified that he told her to fly at that altitude.

On cross–examination, Dr. Sparrowe explained that his comments in a letter dated October 19, 1973, (defendant's exhibit 7) which indicated his recognition that low level flying would be required in the Eagle Project, were made at an early stage of the project before he knew what type of flying would be in order. Dr. Sparrowe testified that he determined subsequent to the drafting of this letter that low level flying would not be necessary.

**17.** Indeed, Mr. Reed, who had helped train decedent, testified on cross–examination that he has hit power lines that have not been included on aeronautical charts.

844

tors which will establish the bar of contributory negligence. *See, Arkansas–Missouri Power Co. v. Carl, id.* Generally stated, the rule in Missouri on contributory negligence is that "when one voluntarily and unnecessarily places himself in a dangerous situation, when he knows and realizes, or in the exercise of ordinary care for his safety should know and realize, the hazard to which he is being exposed, the defendant may not be held to respond in damages for the resulting injuries or death." *Gray v. Union Electric Light & Power Co.*, 282 S.W. 490, 494 (Mo.App.1926) (contributory negligence held to be a bar to recovery when experienced electrician voluntarily exposed himself to situation that resulted in his electrocution). *See also, McFarland v. Grau*, 305 S.W.2d 91, 101 (Mo.App.1957); *Carey v. Crawford Electric Cooperative, Inc.*, 347 S.W.2d 184, 188–89 (Mo.1961); *Morris v. Kansas City Light & Power Co.*, 302 Mo. 475, 258 S.W. 431, 432–33 (1924); *Bryan v. Sweeney*, 256 S.W.2d 769 (Mo. 1953).

This Court concludes that in light of decedent's great experience as a commercial pilot and the generally recognized extreme hazard of low level flight below levels where wire could be suspended, decedent's conduct in flying the aircraft at 100 feet over the winding Osage River at a speed of approximately 100 m.p.h. was careless and reckless behavior sufficient to find decedent contributorily negligent in the accident on February 10, 1975. Hence, this Court finds that decedent was contributorily negligent on the occasion in question.

## V.

For the reasons above–stated, it is hereby

ORDERED that judgment be entered in favor of defendant and against plaintiffs in accordance with the foregoing findings and conclusions.