**LAKELAND R–3 SCHOOL DISTRICT, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 80–0188–CV–W–8.**

United States District Court, W. D. Missouri, W. D.

Aug. 3, 1982.

C. E. Weedman, Jr., Crouch, Crouch, Spangler & Douglas, Harrisonville, Mo., for plaintiff.

Robert E. Larsen, U. S. Atty., Kansas City, Mo., for defendant.

## ORDER

STEVENS, District Judge.

This is an action for damages to the elementary school in Deepwater, Henry County, Missouri, which is owned by plaintiff, Lakeland R–3 School District. Plaintiff alleges that the damage to the school occurred on March 8, 1978, when the United States Army was using explosives to destroy Missouri State Bridge No. 5, located approximately 1.5 miles from the school. Federal jurisdiction is premised upon the Federal Tort Claims Act, 28 U.S.C. Section 2671 and 28 U.S.C. Section 1346(b). The complaint was timely filed pursuant to 28 U.S.C. Section 2401.

The court trial of this matter consumed two days. At the close of plaintiff's case, the defendant moved for a directed verdict, which was taken under advisement and is now overruled. A brief review of the facts as jointly stipulated and as presented at trial through testimony and documentary evidence is necessary prior to the discussion and resolution of the remaining issues presented.

Construction on the Harry S. Truman Dam and Reservoir near Warsaw, Missouri, by the United States Army Corps of Engineers had been ongoing for several years prior to March, 1978. It was anticipated that the lake waters would inundate some roads in the Henry County area so the Fifth Engineer Battalion (Combat) of the United States Army at Fort Leonard Wood, Missouri, was offered the opportunity to destroy two bridges in the area. Prior to the demolition of State Bridge No. 5, the plans to destroy the second bridge were cancelled so the Army was only involved in the elimination of one bridge from the Truman Lake area.

The Fifth Engineer Battalion utilized the "Warsaw Project," as the demolition of the bridge was known, as a training exercise to provide the men of the Battalion with experience in "combat" bridge demolition. The Army's preparation for demolition included aerial reconnaissance of the blast site, preliminary surveys of some structures near the site (but not the school) and development of a plan for the project based on materials known as Army Field Manuals. The project was begun in late February, 1978, and State Bridge No. 5 was destroyed by the battalion on March 7–8, 1978. The plaintiff's claim for damages in the amount of $175,000 was presented to the Army Corps of Engineers on December 14, 1978, was considered under provisions of 10 U.S.C. Section 2733, and was denied by the

Army on September 7, 1979. This action was commenced February 22, 1980.

### The Discretionary Function Exception

The threshold question presented in this action is whether the discretionary function exception to the Federal Tort Claims Act bars suit against the defendant.[1] Whether a particular act of a government official can be defined as the performance of a discretionary function is a jurisdictional issue, which, if so defined, bars the plaintiff's claim, *Konecny v. United States*, 388 F.2d 59 (8th Cir. 1967).

■■ The court's search for the answer to the "discretionary function question"— that is, a determination of whether the Army's acts here involved such a function— begins with the seminal case on that subject, *Dalhite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The inquiry necessary to determine if the exception applies focuses on whether the particular act of a government agent is one involving the formulation of government policy or whether the act in question occurred while implementing at an operational level a policy which had already been set. There is extensive discussion within the cases concerning the distinction between the formulation of policy and performance which reflects an already settled policy. *Blessing v. United States*, 447 F.Supp. 1160 (E.D.Pa. 1978), which contains a very thorough examination of the discretionary function exception concludes that lower court decisions since *Dalhite* do not comprise a "particularly coherent body of case law." 447 F.Supp. at 1172. It may be said, however, that the cases generally consider the level at which the act occurred, the ability of the judiciary to evaluate the act, and "whether judicial evaluation would impair the effective administration of the government." *Lindgren v. United States*, 665 F.2d 978, 980 (9th Cir. 1982).

Additional criteria for distinguishing between planning and operation were suggested in *Driscoll v. United States*, 525 F.2d 136 (9th Cir. 1975), which held that the decision of an army engineer not to install warning devices at an intersection was an operational act, not a discretionary one, and was thus actionable. Such additional criteria include the character and severity of the plaintiff's injuries; the existence of alternative remedies; the capacity of the court to evaluate the propriety of the official's actions; and the effect of liability on the administration of the function in question.

A recent opinion of this court found no discretionary function exception and hence no jurisdictional bar to plaintiff's action for wrongful death, alleging governmental liability where an electrical power line strung over a river did not appear on government air charts as required by governmental specifications. *Allnutt v. United States*, 498 F.Supp. 832 (W.D.Mo.1980). *Allnutt* held that because the United States had a policy regarding power lines as contained in the agency specifications, the question of defendant's negligence in preparing charts in accordance with those developed specifications was actionable and defendant's act was an operational level function.

■ There was no question during the trial of this action of the Army's policy regarding demolitions. The evidence adduced demonstrated that the Army officers who planned and executed the demolition of the bridge (Major Ronald D. Laux, Captain

---

1. 28 U.S.C. Section 1346(b) affords a federal court forum involving actions

   . . . For injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

   28 U.S.C. Section 2680(a) prohibits claims ". . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

Jerry G. Love, and Sergeant Richard L. Demby, all of whom testified) relied on Army Field Manuals 5–25 and 5–34, on the Corps of Engineers United States Army Manual 385–1–1, and on the Safety Annexes to the "Military Operations/Logistics Order" pertaining to the project.

Defendant contends that the acts leading to the establishment of the plans and specifications for the demolition of this particular bridge are covered by the discretionary function exception. Each of the Army personnel who testified indicated that the materials just identified were used as guidelines. Major Laux described Field Manual 5–25 as containing "all the information we really need on demolitions . . ." and he said the Corps of Engineers Manual 385–1–1 was referred to when they "couldn't get any other training guidelines." He also testified that he reviewed the plan with Captain Love to insure that it met the Army's specifications. The existence of these manuals indicates that the Army had already made a decision as to its policy on demolitions; the acts performed by the United States Army personnel were an attempt to implement that policy, thus the act in question occurred at an operational level.

To determine whether the discretionary function exception applies, the court must consider the other factors listed in *Lindgren,* 665 F.2d at 977, which refer to the court's ability to evaluate the act in question and the impact of judicial review upon the effective administration of government. Applying those factors to the case at bar, the act in question, blasting, is an act which courts are " 'fully capable of scrutinizing . . . by the usual standards applied to cases of professional negligence.' " *Blessing,* 447 F.Supp. at 1182–83, (quoting *Griffin v. United States,* 351 F.Supp. 10, 33 (E.D.Pa. 1972)). A review by this court of the

Army's act involved here will not have an adverse impact upon the effective administration of government or the administration of Fort Leonard Wood nor "will it make the United States liable for large and numerous claims." *Driscoll,* 525 F.2d at 138.[2]

This court concludes that the acts performed by the United States Army in demolishing State Bridge No. 5 were performed at an operational level and thus this court has jurisdiction under the Federal Tort Claims Act to adjudicate plaintiff's claim against defendant United States.

### Negligence

■ The jurisdictional issue having been resolved, the court must determine whether there was any operational level negligence in the demolition of State Bridge No. 5. The issue of liability under the Federal Tort Claims Act is to be determined by the law of the place of the tort. In Missouri the general rule is that when one intentionally detonates explosives, he is "absolutely liable for any injuries and damages which are the proximate result of such explosions." *Donnell v. Vigus Quarries, Inc.,* 526 S.W.2d 314, 316 (Mo.App.1975). That state standard cannot be employed here, however, because *Dalhite* held that the United States cannot be held to a standard of strict liability without fault.

The post trial memorandum filed by plaintiff reviews the evidence which plaintiff contends establishes the Army's negligence in demolishing the bridge. However, plaintiff has not directed the court to any cases which fill the void created by the court's inability to apply the strict liability standards of the State of Missouri. Defendant, on the other hand, in its post-trial brief, analogizes to other cases involving the accidental, not intentional, detonation of liquid explosives. In *Paisley v. Liebowits,* 347 S.W.2d 178, 183 (Mo.1961), which

---

**2.** This case is distinguishable from those cases which relieve the military of liability for operations relating to national security or for broad policy decisions pertaining to the undertaking of a particular program. *See Blessing,* 447 F.Supp. at 1181 n. 29 and those cases cited therein.

involved a child trespasser who was injured when explosive liquid stored on the defendant's land accidentally exploded, the court stated that the standard of care for one using explosive materials is that of a "reasonably careful person under the same or similar circumstances." That standard is restated in *Natoli v. Johnson,* 490 S.W.2d 275 (Mo.App.1973).

▪ In view of the restriction upon the use in this case of the standard of care which the Missouri courts have traditionally applied to blasting cases, the court will utilize the standard of care suggested by defendant, that is, in a situation where employees of the federal government are detonating explosives in the performance of operational level acts, those employees are under a duty to exercise the care that a reasonably careful person would exercise under the same or similar circumstances when detonating explosives.

To maintain a negligence action, the Missouri courts generally require the plaintiff to demonstrate that the defendant owed a duty to the plaintiff, that the defendant breached that duty and because of the breach, the plaintiff was proximately injured. *Kim Manufacturing, Inc. v. Superior Metal Treating, Inc.,* 537 S.W.2d 424, 428 (Mo.App.1976); *Hulahan v. Sheehan,* 522 S.W.2d 134, 139 (Mo.App.1975). "[D]uties imposed by the law of torts arise out of the circumstances and are based on foreseeable or reasonable anticipation that harm or injury is a likely result of acts or omissions to act." *Taylor v. Hitt,* 342 S.W.2d 489, 494 (Mo.App.1961); *see Blevins v. Cushman Motors,* 551 S.W.2d 602 (Mo.1977).

▪ Considering the circumstances of this case where explosives were used within a mile and a half of a community containing a public elementary school, it should have been foreseeable to defendant that harm to persons or real or personal property within that distance might occur as a result of the blasting. Defendant owed a duty to those who foreseeably would be harmed if the defendant failed to act as a reasonably careful person. Those to whom defendant owed a duty included plaintiff.

▪ The question which this court must answer is did the defendant, acting through the Fifth Engineer Battalion, demolish State Bridge No. 5 with explosives while using the degree of care that a reasonably careful person would have used under the same or similar circumstances?

The plaintiff's evidence on the negligence question consisted of the January 4, 1982, deposition of James Redyke, the owner and operator of a business in Tulsa, Oklahoma, specializing in the demolishing and blasting of buildings, bridges, and structures and who has done contracting work for the United States Army Corps of Engineers. His credentials clearly qualify him as an expert in blasting and demolition. Mr. Redyke had examined seventeen photos of the site at the pre-blast, blast, and post-blast stages; a map of the general area (not in evidence before this court); and the defendant's answers to interrogatories filed by plaintiff on September 11, 1980, pertaining to the type and quantities of explosives used. Redyke also discussed two manuals— the Army Corps of Engineers' Manual 385–1–1 and portions of Chapter 23 and 26 of the *Blasters' Handbook,* prepared by the E.I. Du Pont De Nemours and Co. (175th Edition). Since Mr. Redyke's conclusions are based on the photos, the event depicted in those photos should first be explained through the testimony of the Army officers who participated in the "Warsaw Project."

Major Laux explained the process by which State Bridge No. 5 was selected from the 115 bridges in the area and detailed the planning for the execution of the project. Major Laux told the court that it was his responsibility to see that the communities surrounding the bridge were notified of the scheduled demolition and he said he knew that some Army personnel had met with county officials. Clarenita Brack, principal of the school, testified that no one came to

the school to warn of the planned blasting nor did the school receive any written notice regarding the project. The "logistic order" for the project was submitted to the court. It included the plans for transportation, shelter, food, and other support items for the battalion during the project; however, no actual plans for or records from the demolition exist. In "Annex D (Safety)" of the logistics order, it states "[g]eneral safety will be in compliance with FM 385–1–1 . . . . " In the early stages of the planning, Major Laux said it was decided that there would be a limit placed upon the number of pounds of explosives which could be detonated at any one time. Laux said the number of pounds chosen was eighty pounds because an engineer battalion from Fort Riley, Kansas, had experienced "success" with that amount. It was not clear from Major Laux's testimony whether he knew what the Fort Riley Battalion had been demolishing; the amount of explosive used at one time by the Fort Riley Battalion is the only evidence this court has on that project. It should be noted that no pound limit is imposed in the field manuals upon which Laux relied, but FM 385–1–1 does contain a section on vibration and damage control which is discussed at length below.

The actual calculations for the demolition of the bridge were performed by Captain Jerry Love who followed the formula contained in Field Manual (FM 5–34) at pages 24 through 26. Love described the configuration of the bridge as a deck (or the roadway surface) sitting atop thirty-five concrete piers—seven rows of piers five piers deep. Using a chart of the bridge, Love explained the placement of the fourteen blasts on March 7–8, 1978. The amount of C–4 plastic explosives used in each of these blasts was determined by Love using the equation found in FM 5–34. The equation contains variable components pertaining to 1) the radius of the structure to be blasted; 2) the strength of the material used in the structure; and 3) the tamping factor which assigns a numerical value to each of the various methods of placement of the explo-

sives. The table in the manual denotes the following methods of placement and tamping factor values: internal, 1.0; stemmed, 1.0; deep water, 1.0; elevated untamped, 1.8; shallow water, 2.0; ground placed tamped, 2.0; and ground placed untamped, 3.6. The factor in the equation regarding the strength of the material is derived from a table of values in FM 5–34 which correlates the type of concrete. A portion of the table reads: ordinary concrete, with a one and a half to two and a half foot radius equals .62; and reinforced concrete with one and a half to two and a half foot radius equals .96. Prior to performing the equation to determine the amount of explosives to be used, FM 5–34 at page 27 advises "1. Measure thickness of concrete; 2. Determine method of placement . . . ."

Captain Love indicated that each bridge pier had a one and one half to two foot radius which is the smallest measurement shown on any of the tables in the manual. He testified that he selected the elevated untamped method and that he selected .96 as the value for the strength of the concrete in the piers. Love did not specifically say that the strength value was selected based on reconnaissance but there were no other reasons given for his selection.

The method of placement which Love selected—elevated untamped, which means the explosive is placed or hung on the outside of the structure to be demolished—was discussed during the cross examination of Major Laux. Laux was asked if, in designing the plan, he considered confining the explosives instead of placing the charge in the open on the outside of the pier. He replied that the training manuals advise confining explosives by drilling holes in which to place the explosives only if a limited number of explosives are available but he said external charges are hung because "time is usually of the essence." Laux did not explain why time was so crucial under the training conditions of the "Warsaw Project."

There is a second method of confining the explosives referred to in both FM 5–34 and

FM 5–25 which Major Laux did not discuss —tamping. Field Manual 5–25 states that "all external charges should be thoroughly tamped with earth and sandbags if time and the size, shape and location of the target permit." None of the Army personnel indicated to the court why dirt or sandbags could not have been utilized and Sergeant Richard Demby, who participated in the project, told the court he thought that the battalion had a tractor and a loader at the blast site.

Of the fourteen charges exploded on the bridge, four occurred on March 7, 1978, and the remainder were shot on March 8, 1978. Following the fourteenth blast, Love recalled that the Deepwater marshall and "someone else" came to the site and requested the battalion to stop blasting because glass in the school windows was breaking. Although there had been a third day of blasting scheduled, Love said it was cancelled the morning of the third day as they were preparing to blast. Based on Captain Love's utilization of the FM 5–34 formula, he determined that fourteen pounds of explosives would be required to destroy each pier. In keeping with the limitation imposed upon the amount of explosives to be detonated during any one blast, Love said the progression of the demolition was as follows: the piers were destroyed five piers at a time using an approximate total of 75 pounds of explosives eight times (one explosion per row of piers plus one misfire); the deck was collapsed at one end using 30 pounds of explosives; two charges of 75 were placed under water to complete the collapse of the deck following the eight explosions on the piers; and finally, three holes were shot behind one of the bridge abutments using 80 pounds for each of two explosions and 40 pounds for the final shot. The total amount of C–4 plastic explosives used in the two-day period was 980 pounds.

In the deposition testimony of Redyke, he contrasted the Army blasting procedures depicted in the photos with the procedures performed under civilian industry standards. He stated that the blasting industry standard is to drill holes and place explosives within those holes. If drilling is not possible, he said the second best procedure would be to place the explosives at ground level and to cover them with "a large mound of dirt" which reduces the volume, the noise and air blast.

Redyke described the practices which would have been required under civilian standards if he had been hired to demolish State Bridge No. 5. He said that the Army Corps of Engineers would have required that he submit, prior to demolition, a blasting plan outlining the overall approach to the blast, the location of the holes in which to confine the explosives, and the number of pounds of explosives per delay. Before attempting destruction of the structure, Redyke said that a test shot would be fired to reveal the "basic condition of the concrete," whether the calculated amount of explosives is actually appropriate, and the after-results of the shot as determined by a seismograph, which monitors ground movement and air blasts. The Corps requires the use of a seismograph in any blasting project according to Redyke.

Though he disclaimed being an expert in seismographs, Redyke explained that since the seismograph monitors ground vibration and air blasts, it could have been used in the vicinity of the Deepwater Community to check for vibration of air blast damage during the test shot. In the Army Corps of Engineers Manual 385–1–1, the section on vibration and damage control indicates that "[p]rior to initiation of vibration control blasting operations, a written plan for monitoring the operation shall be established," (25.C.04, p. 107); "vibration shall be monitored, recorded, and interpreted by qualified personnel," (25.C.06, p. 107); and "[o]n operations where vibration damage may occur, the energy ratio as recorded at structures or facilities by seismograph shall not exceed 1.00," (25.C.02, p. 106). The section also contains a table of limitations on vibrations at structures.

When witnesses Laux and Love were questioned about the use of a seismograph, they acknowledged that they were acquainted with it as an instrument which measures earthquakes but said they did not know about the use of a seismograph during the detonation of explosives. Laux testified that he did not consider using a seismograph because it was not referenced in the training manual that was their guide. It should be noted that the section in the Army Corps of Engineer Manual 385–1–1 on vibration and damage control is on the same page as a section dealing with the impact of radio waves upon the detonation of electrical blasting caps which was reprinted in the logistic order pertaining to the "Warsaw Project."

Redyke's review of the photos prompted him to comment upon the strength of the concrete. "I can tell from this picture that the basic size of the steel which appears to be one inch in diameter, and there is no spiral wrapping which is, again, a form of reinforcing that wraps around the bar which makes the concrete a little tougher to shoot. The fact there is no spiral wrapping here would indicate to me that I wouldn't have to hit it as hard." (Deposition tr. 29) He further stated that one photo showed "some deterioration of the concrete in the bridge cap and column which would indicate to me you wouldn't need a volume of explosive because you have deteriorated concrete." (Deposition tr. 31) As indicated above, the formula in FM 5–25 distinguishes between types of concrete and utilization of the values assigned to concrete which is not reinforced would have resulted in a reduction of the amount of explosives used.

From the photo, Redyke estimated the amount of explosives attached to each pier to be twelve pounds, an amount which, in his expert opinion, was in excess of the amount needed to destroy each pier. He testified that if the charges had been placed internally, fifty pounds of explosives should have been sufficient to destroy all of the piers and collapse the deck as shown in the photos.

Redyke's examination of the photos elicited one other observation which merits attention here. He noted, and the Army personnel agreed, that the second day of the blasting appeared to be cloudy and overcast—conditions which he said increased the likelihood of air blast damage.

The phenomena which enhance the potential for air blast damage were explained by Thomas Langley, plaintiff's expert witness on structural damages, and Dr. Jerry Schweiker, defendant's expert witness, and were discussed in the *Blasters' Handbook* admitted into evidence. According to Schweiker, when the air above the clouds is warmer than air at ground level, a temperature inversion exists which causes the sound waves to rise into the atmosphere and instead of being dissipated into the atmosphere, the waves travel in a "rainbow"-shaped path, arcing downward, focusing energy upon a point at ground level.

This focusing of the air blast is known as overpressure. Dr. Schweiker testified that where weather conditions are overcast and the potential for overpressure exists, the standard operating procedure for any demolition project should require that no explosions be detonated during such conditions or at least a reduction in the amount of explosives should be mandated. Upon cross examination, Schweiker acknowledged that where weather conditions are not conducive to blasting, drilling or tamping of explosives would reduce the impact of air blast. The *Blasters' Handbook* suggests methods of controlling air blasts and the first listed is "Avoid the use of unconfined explosives" (Ch. 26, P. 445). The handbook indicates that unfavorable atmospheric conditions for blasting include "cloudy days with a low ceiling...," (Ch. 26, P. 445). In his deposition, Redyke concluded that there are two precautions which a demolition contractor should take to minimize air blast damage: cover the charges and select favorable weather conditions. (Deposition tr. 51).

In response to the court's hypothetical question which assumed the conditions actually present during this bridge demolition, Dr. Schweiker indicated that such a detonation did not represent good and careful practice in the industry which uses explosives and causes detonation.

Based on a careful assessment of the testimony, stipulations, and documentary evidence, this court concludes that the Fifth Engineer Battalion did not use the degree of care that a reasonably careful person would have used in the destruction of State Bridge No. 5. Therefore, this court finds that defendant was guilty of a breach of the duty owed to plaintiff and therefore there was operational level negligence in the performance of the "Warsaw Project."

The third component of negligence under Missouri law is that plaintiff's damages must be the proximate result of the defendant's act or failure to act.

> Generally, it is sufficient to constitute proximate cause that the negligence charged was the efficient cause which set in motion the chain of circumstances leading up to the injury. The test is not whether a reasonably prudent person would have foreseen the particular injury but whether, after the occurrences, the injury appears to be the reasonable and probable consequences of the act or omission of the defendant.

*Smith v. Secrist,* 590 S.W.2d 386, 389 (Mo. App.1979) (quoting *Floyd v. St. Louis Public Service Co.,* 280 S.W.2d 74, 78 (Mo.1955).

■ The nature of plaintiff's damage must be considered as a prelude to the determination of proximate cause. Plaintiff presented four witnesses whose testimony concerned damages: Clarenita Brack, principal of the Deepwater Elementary School; Don Green, the custodian of the school; Thomas Langley, an engineer from Kansas City, Missouri; and Richard Herndon, a structural engineer with the Army Corps of Engineers.

Brack and Green recalled the blasting on March 8, 1978, and described the sensations experienced in the school as a blast "noise" which vibrated within the building. Both witnesses listed the damage observed that day and agreed that windows were disintegrated in the classroom used for the kindergarten while other windows throughout the building and the skylight in the center of the school were broken.

Green, who has been custodian since 1973, described the condition of the building before the blast as "good" and said it had not required much repair work in the past. A portion of the school was built in the early 1900's with the remainder of the classroom area added in the 1930's; a gymnasium was built around 1942, Green said. Subsequent to the blast, Green and Brack observed cracks in the plaster walls of the school, leaks around the skylight, and cracks in the masonry in the building's superstructure.

Engineer Langley conducted a survey of the school premises and told the court that in addition to the damages detailed by Green and Brack, he found damage to the foundation on the east side of the school. It was Langley's expert opinion that the proximate cause of the damage to the school was the blasting performed March 8, 1978, by the Fifth Engineer Battalion. While defendant's witness Schweiker did not agree with Langley's conclusion regarding the extent of the damage, he did testify that the detonation of explosives on a day where there was higher overpressure than could normally be predicted would result in window breakage and "some extension of some existing cracks" in plaster or concrete. Subject to the court's finding below regarding the extent of plaintiff's damage, the court concludes that the damage to plaintiff's structure "appears to be the reasonable and probable consequence" of the blasting done by defendant.

■ It remains then for the court to determine the extent of the damage which resulted from the March 8, 1978, demolition of State Bridge No. 5.

Langley explained in great detail his theory as to the causes of the damages to the

school. The damage to the foundation was the result of the seismic pressure which, he said, means the vibration through the soil from the blast site to the school. The second cause—overpressure or air blast—precipitated the cracking in the masonry and walls and the window breakage, according to the witness. Due to his observation of what he called foundation damages and because of his concern about the geologic features of the earth underlying the school, Langley consulted with a soil testing service, Terracon, to determine whether structural settlement may have resulted from the blast-induced damage. Terracon tested the soils adjacent to the school and in a report to Langley dated April 10, 1980, concluded

> based on the observed soil conditions and assumed magnitude of foundation loads, structural settlements resulting from blast-induced loading of the foundations would not be anticipated. While it is conceivable that very minor compression of the foundation's soils may have occurred at the instant of loading, for the soil conditions existing beneath the structure, continued structural settlement would not be anticipated.

In a report to the School District on April 28, 1978, Langley enumerated the damages to the school and estimated the costs. In his trial testimony he provided an updated cost for each item as follows:

| Description of Work | April 28, 1978 Report On Estimated Cost | Trial Testimony |
|---|---|---|
| 1. Engineering tests to determine rate of foundation movement. | $ 5,000.00 | $ –0– |
| 2. Preparation of Contract Documents for building repairs. | $ 5,000.00 | $ 7,500.00 |
| 3. Stabilization of Building Foundation. | $15,000.00 | $25,000.00 |
| 4. Removal and Replacement of Skylights. | $ 2,000.00 | $ 2,700.00 |
| 5. Plaster repairs and drywall, painting. | $17,000.00 | $22,950.00 |
| 6. Masonry Repairs. | $18,500.00 | $24,975.00 |
| 7. Replacement of Windows. | $ 1,000.00 | $ 1,350.00 |
| TOTAL | $63,500.00 | $84,475.00 |

It should be noted that in plaintiff's trial brief the cost of the Terracon survey is shown as $1,650.00 and the engineering fees for Langley, not considering this litigation, would have been $1,500.00.

With respect to the question of whether the blasting caused or aggravated damage to the foundation, defendant's witness Dr. Schweiker addressed himself to the difference between seismic pressure and overpressure concluding that there was not ground vibration which would have caused any foundation damage regardless of the nature of the rock underlying the area; however, Schweiker conceded that because of weather conditions and temperature inversion there was overpressure damage to windows with some extension in the existing cracks in the plaster and concrete. Schweiker discussed the uncertainties regarding the extent of the overpressure damage in a building of this age. In answer to a question of the court, he indicated that there *might* be a cumulative effect of the explosions wherein a crack might be extended a small amount with each blast assuming the temperature inversion continued to exist.

Richard Herndon of the Army Corps of Engineers testified that he and R. J. Dworkin, a former Corps employee, performed an inspection of the school in June, 1978, and he was questioned about a report dated July 3, 1978, to which was attached a construction cost estimate sheet prepared by Dworkin. Herndon's report recommended that all damaged glass be replaced and that the loose plaster be repaired. Because he said he did not observe any recent damage to the foundation or extensive damage to the masonry, he testified that he only recommended the replacement of bricks which he observed had fallen or been loosened around the parapet. His report states that he does not consider the building to be any more structurally unsafe now than it was before blasting. Dworkin's cost estimates provide $1,939 for window replacement and broken plaster; $22,079 to patch cracks and paint the entire building, a total of $24,018.

The parties were unable to agree on the appropriate measure of damages to be ap-

plied in this case. Defendant recapped the Missouri rule which it urged the court to employ: the measure of damages to real property is the difference in fair market value of the property before and after the injury, or the cost of restoring the property whichever is less. *Casada v. Hamby Excavating Co., Inc.,* 575 S.W.2d 851, 858 (Mo. App.1978). Defendant argues that plaintiff has not shown that the cost of restoration is in fact less than the diminution in value. Plaintiff counters with a line of cases which hold that where the fair market value of a building or of a public plot of land is unascertainable the court should apply the alternate measure of damages, that is, the expense of restoration. *State Highway Commission v. Mount Moriah Cemetery Association,* 434 S.W.2d 470 (Mo.1968); *Reorganized School District No. 2 v. Missouri Pacific Railroad Co.,* 503 S.W.2d 153 (Mo.App. 1973). On the basis of the discussion in *State Highway Commission,* "[w]hen the property is such that evidence of fair market value is not obtainable, necessarily some other formula for fixing the fair value of the property must be devised." 434 S.W.2d at 472, the court finds the appropriate formula in this case to be the cost of restoration. *See Smith v. Norman,* 586 S.W.2d 84 (Mo.App.1979).

This court has considered all the testimony and documentary evidence and finds that there was blast-induced damage to the above-ground walls, masonry, windows and skylight of the Deepwater Elementary School. The evidence does not support a finding that the foundation of the building was impaired by the blast; however, the court recognizes the obligation of the school district to employ consultants to insure the safety of the premises. Therefore, the court finds the plaintiff's damages to be as follows:

1. Engineering tests to determine rate of foundation movement –    $ 3,150
2. Preparation of contract documents for building repairs –    $2,500
3. Removal and replacement of skylights –    $ 2,700
4. Plaster repairs and drywall, painting –    $17,000
5. Masonry repairs –    $18,500
6. Replacement of windows –    $ 1,350

        TOTAL    $45,200

It is therefore ORDERED

that judgment shall be and is hereby entered for plaintiff in the amount of $45,200 plus the costs of this action.