**CULVER–STOCKTON COLLEGE, Respondent,**

v.

**MISSOURI POWER AND LIGHT COMPANY, Appellant.**

No. 48361.

Missouri Court of Appeals, Eastern District, Division Three.

March 12, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 26, 1985.

Francis X. Duda, St. Louis, for appellant.

Dennis W. Smith, Canton, for respondent.

CRANDALL, Judge.

Defendant appeals from a $125,050 judgment entered on a jury verdict in favor of plaintiff on a claim for negligence in failing to inspect and properly maintain an electrical power line, which resulted in a fire at a building owned by plaintiff.

Defendant raises seven points on appeal. The first two points claim plaintiff failed to make a submissible case. Point three claims there was no evidence to support the opinion of plaintiff's expert witness who testified about the cause of the fire, and that the expert's testimony invaded the province of the jury. Defendant's fourth and fifth points claim the court erred in admitting evidence and instructing the jury on replacement value of the building. Point six alleges error in admitting testimony of a professor regarding ownership of personal property damaged or destroyed in the fire, because the testimony was based on documents not produced at trial. Defendant's final point claims the verdict was excessive. We affirm.

A fire extensively damaged the west music building on the campus of Culver-Stockton College in Canton, Missouri, on June 5, 1977. Prior to the fire, Professor Grant Kenner saw smoke coming from a power line which ran to the building. He could

see two of three wires burned in two. Professor Kenner testified there was a branch of a tree within a few inches of the damaged portion of the cable. Ten to fifteen minutes after seeing the smoking cable, he saw smoke coming from the music building.

David Bader, who was visiting the campus that day, testified he saw "a fire arcing across" the power line. He placed the location of the arcing in a tree just "about halfway or more between the trunk of the tree and outside limbs, the end of them."

The local volunteer fire department responded and fought the blaze. Firemen attempted to enter the building, but a fireman was shocked twice as he walked inside the building. One of the firemen then cut the two "hot" wires on the power line leading to the building to cut off power to the structure. After the wires were cut, the crew returned to go into the building but firemen again were shocked. This time, the third wire which was the neutral wire on the line was cut. After this third wire was cut, there were no more shocks to the firemen.

Defendant had purchased the local power system from the City of Canton in January of 1976.

■ Defendant's first two points deal with the submissibility of plaintiff's case. We look at the evidence, together with the reasonable inferences arising therefrom, in the light most favorable to the plaintiff. *Ward v. McQueen*, 670 S.W.2d 176, 177 (Mo.App.1984). First, defendant claims plaintiff failed to establish the cause of the fire or the cause of the failure of the electric cable.

■ Plaintiff's expert, Dr. Armington, testified specifically that in his opinion the cause of the fire was the melting together of the wires in the cable. The neutral wire, which normally did not carry current, came in contact with a live wire and began carrying current. The current ran through the neutral wire into the building. The ground wire at a water cooler thus became energized, in turn energizing the frame of the water cooler, which energized another ground connection from the frame to a water pipe. This ground wire became very hot, igniting nearby combustible material. The water cooler was the only appliance on in the building at the time of the fire. The cooler was determined to be the place where the fire started. The fact the water cooler was energized explained why the firemen received shocks when they went into the building and began spraying water.

Dr. Armington testified that the failure of the wire was caused by branches rubbing on the cable, and that this rubbing caused the neutral wire to come in contact with a live wire. Another expert testified that evidence of the rubbing would not necessarily be visible because the burning of the wire would destroy any evidence of abrasions. Witness Bader testified he saw a flash and fire in the tree about halfway between the trunk and the outside limbs shortly before the fire was noticed in the building. Witness Professor Kenner testified that he saw the cable smoking. He stated he saw a branch within a few inches of the wire where the fire was.

There was evidence it was windy on the day of the fire, suggesting the branches could have been blown against the wire. There had been a similar problem with the cable failing in the same tree because of the tree rubbing against the wire, and the wire had been bolted at the tree after that occurrence to prevent the same thing from happening. This tree was described as being "dense."

We conclude that plaintiff made a submissible case on the issues of whether the failure of the wire was caused by the branches rubbing against it and whether that failure caused the fire.

■ Defendant next claims plaintiff failed to establish the fire was caused by any negligent act or omission on its part. We first note the jury was instructed that negligence meant failure to use the "highest degree of care." Plaintiff presented evidence of minimum industry standards

which state that trees around power lines should be trimmed or removed, and that power lines should be inspected from time to time as experience has shown to be necessary. There was evidence defendant had a tree-trimming crew in the region and had even done some work on the campus, but had not trimmed the tree in question, nor was there a regular, periodic tree-trimming program. Defendant also had been on the campus to work on the electrical service prior to the fire but had not inspected the line in the tree. A meter reader was on the campus once a month but did not check the wire running through the tree. An employee of defendant knew of a previous problem with the same tree rubbing against a wire and causing it to burn through several years earlier. That employee had put a device in the tree to keep the tree from causing more damage to the wire. An employee of defendant testified the company had trained its workers to be observant and look for problems such as branches too close to wires.

We find that there was sufficient evidence from which the jury could conclude that defendant's negligence caused the fire. Defendant's first point is denied.

Defendant's second point alleges there was no evidence to support the giving of the verdict-directing instruction which read:

Your verdict must be for plaintiff if you believe:

First either:
defendant failed to maintain clearance between the tree and the electrical service line it provided to plaintiff's building, or
defendant failed to properly inspect the electrical service line it provided to plaintiff's building, or

Second, defendant, in any one or more of the respects submitted in Paragraph First, was thereby negligent, and

Third, as a direct result of such negligence, plaintiff sustained damage,

unless you believe plaintiff is not entitled to recover by reason of Instruction Number 8.

■ Defendant's assertions that there was no evidence of contact between the tree and the line and that there was no evidence the fire was caused by any such contact have already been addressed. The only new allegation in this point is that there was no evidence that any additional clearance would have prevented the fire or that additional inspection would have indicated any problem with the line.

Plaintiff's evidence showed insulation missing from the wire in the tree. It is logical that the branches could not wear away the insulation on the wire in a short period of time. The erosion was a process occurring over time. It was reasonable to infer the abrasion took place during windy conditions and not constantly; that if the defendant had checked the line periodically, it could have detected the hazard of the eroding insulation; and that had the branches been cut back, the hazard would have been eliminated. Defendant's second point is denied.

Defendant's third point alleges error in testimony by Dr. Armington, plaintiff's expert, who gave an opinion regarding the cause of the fire. In response to a hypothetical question, Dr. Armington began to respond:

A. It is my opinion that the careless and improper act of Missouri Power and Light Company in allowing—

. . . . .

A.—in allowing to exist within that tree for more than a year a condition in which the tree and the wires should—could scrape together to such an extent as to damage the insulation on one of the two insulated conductors to the tree....

Defendant's brief claims the witness was not competent to render this opinion on the legal effects of defendant's conduct, that the opinion invaded the province of the jury, and that there was no evidence that tree branches came in contact with the cable or caused any damage to it.

■ The only objections at trial to the witness's opinion were that it was a nonresponsive answer to the question and that

there was no evidence to support the opinion. There was no allegation at trial the witness was invading the province of the jury. Defendant cannot now raise this issue. "Thus, appellants have run afoul of both the proscription against interposing one objection at trial and another on appeal, and the rule that '[a]n objection to the admissibility of evidence must be specific and contain the proper ground of its exclusion, else on appeal the trial court will not be convicted of error for overruling it.' Consequently, the trial court's ruling on appellants' objection has not been preserved for appellate review." *McNabb v. Winkelmann,* 661 S.W.2d 825, 826 (Mo. App.1983) (Citations omitted). *See also Nagel v. Bi-State Development Agency,* 567 S.W.2d 644, 646 (Mo. banc 1978), and *Prichard v. Dubinsky,* 338 Mo. 360, 89 S.W.2d 530, 531 (1935), both dealing with hypothetical questions.

Thus, the only issue preserved on appeal on this point is whether there was evidence to support the opinion. Defendant's sole argument here is that there was no evidence the branches could have scraped the wire. We have already addressed this issue in our discussion of submissibility. Defendant's third point is denied.

Defendant's fourth point claims the court erred in allowing plaintiff's witness Jack Hafner, an expert witness on the damage issue, to express an opinion regarding the replacement cost for the building. We deny this point, based on our finding, discussed next, that replacement cost could be considered in ascertaining plaintiff's damages.

The proper measure of damages with regard to the building is the focus of defendant's fifth point. The error alleged is in giving the jury this instruction:

If you find in favor of plaintiff, then you must award the plaintiff such sum as you may find from the evidence to be the reasonable cost of replacement of plaintiff's music building.

Defendant claims MAI No. 4.02 is the only proper instruction in a case of this nature. MAI No. 4.02 defines damages for the building at the difference between fair market value before and after the fire. The general rule is that "the measure of damages for tortious injury to real property is the difference in fair market value of the property before and after the injury or the cost of restoring the property, whichever is the lesser amount." *Casada v. Hamby Excavating Co.,* 575 S.W.2d 851, 858 (Mo.App.1978).

The measure of damages based on the difference in fair market value before and after the fire would not be appropriate in this case. Plaintiff's real estate expert testified there was no fair market value for the building because of its location.[1] When the property is such that evidence of fair market value is not obtainable, some other formula must be used. This is especially true in the case of properties such as college campuses. *Reorganized School Dist. No. 2 v. Missouri Pacific Railroad Co.,* 503 S.W.2d 153, 157 (Mo. App.1973), *citing Mount Moriah Cemetery Assn.,* 434 S.W.2d 470 (Mo.1968). "Thus, from Mount Moriah, we have acceptance that fair market value is not to be used where evidence of such value is not obtainable, as in the case of school grounds and campuses." *Reorganized,* 503 S.W.2d at 158.

The court in *Reorganized* upheld the admission of evidence of, and the use of a formula for, replacement cost less depreciation. In *Mount Moriah,* 434 S.W.2d at 472, the court found instructions which called for measuring damages using fair market value in the case of a cemetery to be prejudicially erroneous, where there was no evidence of a market value for cemeteries. A federal court followed *Mount Moriah* and *Reorganized* in holding the appropriate for-

---

1. The real estate expert, on cross-examination, stated that someone might have bought and paid $1500 to $2000 for the structure if the buyer paid the cost of moving it off the campus.

This was purely speculative, as there was no evidence such a move was feasible or that there was a market for moving such structures.

mula for damages was the cost of restoration where there was damage to a school. *Lakeland R–3 School Dist. v. United States,* 546 F.Supp. 1039, 1050 (W.D.Mo. 1982).

Defendant's argument is that the proper measure of damages here should be the difference in fair market value. We have found this inappropriate in the present case. Whether the proper measure should be straight replacement cost, or replacement cost less depreciation, we need not and do not decide. *Reorganized,* 503 S.W.2d at 158. Defendant did not tender an instruction on depreciation nor did its post-trial motions claim the jury should have been instructed on it.

■ As part of its point on the instructional error, defendant claims the jury was confused and misled by the fact it received instructions stating different measures of damages. Instruction No. 11 referred to the building and measured damages by cost of replacement. Instruction No. 10 referred to the contents of the building and measured damages by the difference between fair market value before and after the fire. The instructions were separate and clearly referred to different aspects of plaintiff's damages. Two different measures of damages were needed. There is no reason to believe that the jury was confused. Defendant's fifth point is denied.

■ Defendant's sixth point claims error in allowing Dr. Wesley Tower, a professor of music at the college at the time of the fire, to testify regarding ownership of the musical equipment damaged or destroyed in the fire. Defendant claims the best evidence rule was violated because when Dr. Tower testified the school owned the personal property in the building, he was basing his testimony on his examination of school records which were not produced at trial. As a second part of this point, defendant claims allowing this testimony without the records deprived it of the right of cross-examination concerning the records.

"The personal property with which we are concerned ... are not items to which one ordinarily acquires a formal 'title.' The question of ownership is not a matter of law, and oral evidence from a witness with knowledge concerning ownership of such chattels is competent, primary evidence of the fact of ownership." *Hallmark v. Stillings,* 648 S.W.2d 230, 234 (Mo.App.1983). In addition, "exclusive possession and control of personal property is prima facie evidence of ownership." *State v. Patchen,* 652 S.W.2d 265, 267 (Mo.App. 1983). The college had exclusive possession and control of the property in its building.

Dr. Tower had personal knowledge concerning ownership of the musical equipment. He stated: "The care, maintenance, purchasing, acquisition, disposal, maintaining the inventory, whatever was done was my responsibility.... Nothing was purchased without it crossing my desk first." He had been at the college for eleven years.

Defendant's reference to the best evidence rule is not appropriate. "[W]here a fact ... to be proven exists independently of a writing, and there is also evidence of such fact written in writing, then both sources, i.e., oral or written evidence, become primary evidence and the best evidence rule is inapplicable." *Jourdan v. Gilmore,* 638 S.W.2d 763, 770 (Mo.App. 1982).

Dr. Tower was not testifying solely as to what was in the records. He was testifying from personal knowledge that items in the building at the time of the fire were owned by the college. Dr. Tower took inventory of items in the building at the end of each semester and did a visual check of the building after the fire, salvaging what he could. He testified that he looked at purchase orders in the college's records to "double-check my own memory." Defendant's sixth point is denied.

Defendant's final point claims the $125,050 verdict was excessive, because the only evidence of market value for the building was that it was worth $1500 to $2000 if the

purchaser paid the expense of moving the building to a different location. We deny this point for the reasons heretofore stated.

The judgment of the trial court is affirmed.

CRIST, P.J., and SIMON, J., concur.